**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re                                          )
                                               )
LEHMAN BROTHERS INC.,                          )    ORAL ARGUMENT REQUESTED
                                               )
                        Debtor.                )
                                               )    No. 14 Civ. 1987 (SAS)
                                               )    Appeal arising from SIPA Liquidation
                                               )    Proceeding, Case No. 08-1420 (JMP)
                                               )

## OPENING BRIEF OF JUNIOR UNDERWRITER APPELLANTS

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Mitchell A. Lowenthal
Luke A. Barefoot
One Liberty Plaza
New York, New York 10006
Tel. (212) 225 -2000
Fax (212) 225-3999

*Attorneys for Appellants ANZ Securities, Inc., BMO*
*Capital Markets Corp., BNY Mellon Capital Markets,*
*LLC, Cabrera Capital Markets, LLC, DNB Markets, Inc.,*
*BNP Paribas FS, LLC, nabSecurities, LLC, National*
*Australia Bank Ltd., SunTrust Robinson Humphrey,*
*Inc., and The Williams Capital Group, L.P (collectively,*
*the "Junior Underwriters" or "Appellants")*

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ................................................................... 3

STATEMENT OF ISSUES PRESENTED........................................................... 3

STANDARD OF REVIEW ............................................................................... 4

STATEMENT OF CASE ................................................................................... 4

  A.  The Junior Underwriter Claims for Contribution ................................... 4

  B.  Proceedings Before the Bankruptcy Court ............................................ 6

ARGUMENT ..................................................................................................... 8

  A.  The Bankruptcy Court's Interpretation of Section 510(b) is Erroneous.................... 8

      1.  The Bankruptcy Court's Interpretation of Section 510(b) is at Odds
         with the Cannons of Statutory Construction ....................................... 10

      2.  The Bankruptcy Court's Interpretation of Section 510(b) is Unclear
         and Unworkable in Practice ................................................................ 13

      3.  The Claim or Interest Represented by Such Security Means Only Claims
         Based Solely on Ownership of a Security ........................................... 15

  B.  Under the Proper Interpretation of Section 510(b) the Junior Underwriters'
     Claims Are Not Subject to Subordination ............................................... 16

      1.  Section 510(b) Does Not Apply to the Junior Underwriters' Claims
         Because There Are No Claims or Interests Represented by LBHI
         Securities Pending Against LBI ......................................................... 17

      2.  Subordination of the Junior Underwriter Claims Conflicts with
         the Policy Underlying Section 510(b) ................................................ 20

CONCLUSION................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 510(b) ............................................................................................ passim

11 U.S.C. § 510(c) ............................................................................................ 20

15 U.S.C. § 77k(f) ............................................................................................ 4-5

**Cases**

Colautti v. Franklin,
439 U.S. 379 (1979) ......................................................................................... 11

Hirt v. Equitable Ret. Plan,
533 F.3d 102 (2d Cir. 2008) ............................................................................ 11

In re Betacom of Phoenix,
240 F.3d 823 (9th Cir. 2001) ........................................................................... 20

In re Enron Corp.,
379 B.R. 425 (S.D.N.Y. 2007) ........................................................................ 4

In re Enron Corp.,
341 B.R. 141 (Bankr. S.D.N.Y. 2006) ............................................................ 8, 12

In re Jacom Comp. Services,
280 B.R. 570 (Bankr. S.D.N.Y. 2002) ........................................................... 12, 18, 22

In re Lehman Bros. Inc.,
503 B.R. 778 (Bankr. S.D.N.Y. 2014) ............................................................ passim

In re Lernout & Hauspie Speech Prods., N.V.,
264 B.R. 336 (Bankr. D. Del. 2001) ............................................................... 15, 19

In re Lightsquared, Inc.,
504 B.R. 321 (Bankr. S.D.N.Y. 2013) ............................................................ 19-20

In re Med Diversified,
461 F.3d 251 (2d Cir. 2006) ............................................................................ 12, 20, 21, 22

In re Mid-Am. Waste Sys., Inc.,
228 B.R. 816 (Bankr. Del. 1999) ..................................................................... 22

In re VF Brands, Inc.,
275 B.R. 725 (Bankr. D. Del. 2002) ................................................................ passim

In re William James Del Biaggio III,
No. 12-CV-6447, 2013 WL 6073367(N.D. Cal. Nov. 18, 2013) ...................................... 19, 23

Kungys v. United States,
485 U.S. 759 (1988) ................................................................................................ 11

Levin v. United States,
– U.S –, 133 S.Ct. 1224 (2013) ............................................................................... 10

United States v. Fisher,
6 U.S. 358 (1805) ................................................................................................... 11

United States v. Kozeny,
541 F.3d 166 (2d Cir. 2008) ................................................................................... 15

United States v. Ron Pair Enterprises, Inc.,
489 U.S. 235 (1989) ............................................................................................... 17

**Other Authorities**

16 Collier on Bankruptcy 510.04(1) (2013) ........................................................... 12

H.R. Rep. No. 95-595 (1971) ................................................................................. 16, 21

John J. Slain & Homer Kripke, The Interface Between Securities Regulation and
Bankruptcy – Allocating the Risk of Illegal Securities Issuance Between Securityholders
and the Issuer's Creditors, 48 N.Y.U. L. Rev. 261 (1973) ................................... 21

Merriam-Webster, http://www.merriam-webster.com/dictionary/represent
(last visited Apr. 25, 2014) ................................................................................... 10

Robert J. Stark, Reexamining the Subordination of Investor Fraud Claims in Bankruptcy:
A Critical Study of In re Granite Partners, L.P., 72 Am. Bankr. L.J. 497 (1998) ............ 12-13

Webster's Third International Dictionary of the English Language Unabridged
(16th ed. 1971) ...................................................................................................... 10

This appeal arises from the Bankruptcy Court's decision to subordinate the claims of the Junior Underwriters (the "JU Claims") to all general creditor claims asserted against Lehman Brothers Inc. ("LBI"), an investment bank owned by Lehman Brothers Holdings Inc. ("LBHI"), which was a public company.[1]  Those claims are based on contractual and statutory rights to contribution from LBI for losses incurred defending and settling certain lawsuits related to offerings of securities of LBHI.  While both the Junior Underwriters and LBI participated in these offerings, over ninety percent of the securities offered were underwritten by LBI in the course of its business as a broker-dealer, and LBI was the lead underwriter.  When LBHI filed for bankruptcy protection, numerous actions were brought by purchasers of the offered LBHI securities.  Because it was in a Securities Investor Protection Act ("SIPA") liquidation proceeding, LBI was not named as a defendant (nor was LBHI, due to its own bankruptcy proceeding) and so the Junior Underwriters bore the costs of defending and resolving these actions.

The Bankruptcy Court purported to apply Section 510(b) of the Bankruptcy Code to subordinate the Junior Underwriters' contractual and statutory claims to all other general creditor claims against LBI.   Section 510(b) provides in relevant part that claims arising from contribution or reimbursement on account of the purchase or sale of a security "shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security." 11 U.S.C. § 510(b) (emphasis added).  Thus, if the relevant securities had been securities of LBI, the JU Claims would have been subordinated to the claims of holders of such securities.  Similarly, if the JU Claims were being asserted against LBHI in the LBHI bankruptcy

---

[1]      Initially capitalized terms used in this preliminary statement and not otherwise defined therein have the meanings ascribed to them in the sections below.

proceeding, they would have been subordinated.  But the securities at issue here are securities of LBHI, and the JU Claims are claims against LBI.  There are no claims or interests "represented by" LBHI securities in LBI's liquidation proceeding, and therefore nothing to which the JU Claims can be subordinated.

While this should render Section 510(b) inapplicable on its face, the Bankruptcy Court shoehorned the Junior Underwriters' claims into the ambit of the statute only by deciding that the "'claims . . . represented by such security' are the claims of the [Junior] Underwriters for reimbursement and contribution (and not for recovery on account of the LBHI securities themselves)."  In re Lehman Bros. Inc., 503 B.R. 778, 787 (Bankr. S.D.N.Y. 2014) (the "Opinion").  This circular reasoning subordinates the JU Claims to themselves, pushing the Junior Underwriters behind all general creditors of LBI without reference to the LBHI securities at issue, which are unrepresented in LBI's capital structure.  The Bankruptcy Court's  reasoning also flies in the face of several cannons of statutory interpretation – not least of all the requirement that words be given their ordinary meaning.  Moreover, if claims were simply to be subordinated below their own otherwise-applicable priority, there would be no need to determine subordination in reference to the claims or interests "represented by such security."  The Bankruptcy Court's interpretation renders that clause redundant.  At base, the Bankruptcy Court's holding obliterates Section 510(b)'s basic and intentional distinction between rescission, damages, and contribution claims "arising from the purchase or sale of a security" and "the claim or interest represented by such security."

Given its natural, traditional, construction, Section 510(b) applies only where the underlying securities that gave rise to the claim are themselves represented in the debtors' capital structure.  The legislative history confirms that this was Congress's understanding of the

statutory text.  While the statute does encompass securities of an affiliate of the debtor, its

subordination terms can apply only where those affiliate securities are also represented in the

debtor's priority scheme (e.g., through guarantees or in consolidated proceedings).  None of the

LBHI securities related to the JU Claims "represent" claims or interests in LBI's separate SIPA

proceeding, and so there are no claims to which the JU Claims can be subordinated.  This result,

which is compelled by the text, is also the only one that is consistent with the only two policy

rationales for Section 510(b): to protect the dissimilar risk and return expectations of investors

and creditors and to support creditors' reliance interest on the equity cushion provided by

shareholder investment.  The Junior Underwriters did not take on the risk and return expectations

of an investor in <u>LBI</u> and they did not contribute to <u>LBI's</u> equity cushion.  Section 510(b) does

not, and was not intended to, apply to the JU Claims.

     Accordingly, the Court should reverse the Bankruptcy Court's order subordinating the JU

Claims.

## JURISDICTIONAL STATEMENT

     Section 158(a) of Title 28 of the United States Code provides the Court with jurisdiction

over this appeal from the United States Bankruptcy Court for the Southern District of New York

(the "<u>Bankruptcy Court</u>").

## STATEMENT OF ISSUES PRESENTED

1.  Whether the Bankruptcy Court erred in finding that the JU Claims themselves constituted
    the "claims … represented by such security" for purposes of Section 510(b).

2.  Whether the Bankruptcy Court erred in holding that the JU Claims were subordinated
    pursuant to Section 510(b), where such claims are for contribution on account of damages
    claims arising from the purchase of securities that were not issued or guaranteed by the
    debtor, but rather by its parent corporation that was not a party to the SIPA proceeding
    and, consequently, whose securities did not represent any claims or interests in that
    proceeding.

3.  Whether the Bankruptcy Court erred in holding that the JU Claims were subordinated to all general unsecured creditors of LBI pursuant to Section 510(b) without reference to the LBHI securities on which the JU Claims are based.

## STANDARD OF REVIEW

A bankruptcy court's conclusions of law are reviewed de novo.  In re Enron Corp., 379 B.R. 425 (S.D.N.Y. 2007).  The Bankruptcy Court recognized that, in this case, "the facts are undisputed", and thus conducted no evidentiary hearing.  Lehman Bros. Inc., 503 B.R. at 779.  Accordingly, the Bankruptcy Court subordinated the JU Claims based purely on its construction of the Title 11 of the United States Code (the "Bankruptcy Code").  See id. at 787.  Its decision is subject to de novo review.

## STATEMENT OF CASE

This appeal arises from the Bankruptcy Court's order granting, in part, an objection made by the trustee appointed for the liquidation of LBI (the "Trustee") on the grounds that the JU Claims must be subordinated under Section 510(b) of the Bankruptcy Code.  See In re Lehman Brothers Inc., No. 08-1420 (JMP) (SIPA) (Bankr. S.D.N.Y. Jan. 31, 2014) (order granting the Trustee's one hundred fourth omnibus objection to general creditor claims (no liability claims) (Bankr. Dkt. No. 8177)) (the "Order").  That Order settled the Opinion, in which the Bankruptcy Court held that the JU Claims fell within the scope of Section 510(b) and should be subordinated to all general unsecured claims against LBI.  See Lehman Bros. Inc., 503 B.R. at 787.

**A.**     **The Junior Underwriter Claims for Contribution**

In the course of its business as a broker-dealer, LBI served as an underwriter of securities.  The JU Claims are based on the Junior Underwriters' statutory and contractual rights to contribution from LBI for losses incurred defending and settling certain lawsuits related to various joint underwritings of LBHI securities.  Specifically, the Junior Underwriters' rights to contribution from LBI arise from: (1) contribution provisions in binding agreements between

4

LBI and the Junior Underwriters; and (2) Section 11(f) of the Securities Act of 1933, 15 U.S.C. § 77k(f).

Between 2006 and 2008, LBI was – by many orders of magnitude – the largest underwriter of numerous offerings of registered securities issued by its corporate parent, LBHI. See, e.g., Declaration of Peter Fox ("Fox Decl.") (Bankr. Dkt. No. 7204), Exs. 2-26, In re Lehman Brothers Inc., No. 08-1420 (JMP) (SIPA) (Bankr. S.D.N.Y. Sept. 9, 2013). LBI was the lead underwriter in all of the offerings that underpin the JU Claims. See id. In order to participate in LBI-led offerings during this time period, each of the Junior Underwriters was required by LBI to enter into the Lehman Brothers Inc. Master Agreement Among Underwriters, dated December 1, 2005 ("MAAU"). See id., Ex. 1 (MAAU Preamble); id. (MAAU § 12.8). The MAAU contained provisions that required each underwriter to "contribute, based on its agreed percentage participation in an offering, toward losses or liabilities incurred by another underwriter arising from allegations that the offering materials contained untrue statements or omissions." Lehman Bros. Inc., 503 B.R. at 781. Each of the Junior Underwriters accepted LBI's invitations to participate in various offerings of LBHI Securities, see Fox Decl., Exs. 2-26, and, in so doing, agreed to the terms of the of MAAU, see id., Ex. 1 (MAAU § 12.8).

After LBHI commenced its separate Chapter 11 proceedings in September 2008, a number of purchasers of LBHI securities filed lawsuits, including class actions (the "Actions"), against (among others) the Junior Underwriters. [2] Neither LBHI nor LBI, however, were parties to the Actions. It was alleged in the Actions that, inter alia, LBHI's offering documents contained material misstatements and omissions, and that the Junior Underwriters – in their

---

[2]     See Response of Underwriter Claimants to the Trustee's One Hundred Fourth Omnibus Objection to General Creditor Claims (No Liability Claims) ("Response") (Bankr. Dkt. No. 7206), App. B, In re Lehman Bros. Inc., No. 08-1420 (JMP) (SIPA) (Bankr. S.D.N.Y. Sept. 9, 2013), for a list of the Actions by caption and docket number.

capacities as underwriters of LBHI-issued securities – were liable for damages under Section 11 of the Securities Act of 1933. In response to the Actions, the Junior Underwriters retained counsel to investigate and defend the investors' claims against them.

Litigation related to the Actions proved complex and protracted, and the Junior Underwriters have collectively incurred nearly $78 million of losses in the form of legal fees and settlement payments.[3]  LBI, which was not named as a defendant in the Actions because of the automatic stay associated with the SIPA proceeding, has not shared in the Junior Underwriters' defense costs or contributed to their settlements. This entitles the Junior Underwriters to contribution payments both under the contractual provisions of the MAAU and Section 11(f) of the Securities Act. For its part, LBI has identified only approximately ninety-three thousand dollars in costs associated with obtaining withdrawal of claims asserted against LBI by certain plaintiffs in the Actions – a tiny fraction of the Junior Underwriters' costs. See Fox Decl., Ex. 27.

## B.    Proceedings Before the Bankruptcy Court

On July 12, 2013, the Trustee filed an objection against the JU Claims, arguing, among other things,[4] that the JU Claims must be subordinated under Section 510(b). See Trustee's One Hundred Fourth Omnibus Objection to General Creditor Claims (No Liability Claims) (Bankr. Dkt. No. 6768), In re Lehman Bros. Inc., No. 08-1420 (JMP) (SIPA) (Bankr. S.D.N.Y. July 12, 2013) (the "Objection"). The Junior Underwriters filed their Response on September 9, 2013, and the Trustee filed his reply on December 18, 2013. The Bankruptcy Court heard oral

---

[3]    A tabular summary of the losses, costs and expenses incurred by the Junior Underwriters is attached as Appendix C to the Response. Full details of such losses are provided in the declarations filed by the Junior Underwriters together with the Response.

[4]    The Trustee also questioned the Junior Underwriters' underlying rights to contribution and argued that the JU Claims were somehow contingent. These arguments, although fully briefed, were not the basis for the Order and are not at issue on appeal.

argument on the Objection on January 8, 2014.  See Hr'g Tr. (Bankr. Dkt. No. 8252), In re
Lehman Brothers Inc., No. 08-1420 (JMP) (SIPA) (Bankr. S.D.N.Y. Feb. 18, 2014).  Later that
month, the Bankruptcy Court issued its Opinion subordinating the JU Claims to all general
creditor claims against LBI pursuant to Section 510(b).

      The Bankruptcy Court's Opinion holds that, at least when securities of a debtor's affiliate
are at issue, there is no distinction between the claims for contribution asserted by the Junior
Underwriters, which are asserted against LBI based on losses relating to LBHI securities, and
claims based on the underlying LBHI securities themselves.  Instead, for purposes of applying
Section 510(b), the Bankruptcy Court held that "'the claims . . . represented by such security' are
the claims of the [Junior] Underwriters for reimbursement and contribution (and not for recovery
on account of LBHI securities themselves)."  Lehman Bros. Inc., 503 B.R. at 787.  Although the
statute draws no distinction between debtor securities and securities of a debtor-affiliate, the
Opinion suggests that the meaning of "represented by such security" could vary on this basis,
explaining:

> The phrase 'a claim represented by a security' is subject to interpretation within
> the text of Section 510(b).  The words may have different meanings depending on
> whether a claim relates to a security of the debtor or a security issued by an
> affiliate of the debtor.  When the claims being made against the debtor arise out of
> the purchase or sale of the debtor's own securities, the relative priority of such
> claims may be subordinated to claims that are within the capital structure.  In
> contrast with this example, affiliate securities ordinarily will be the source of
> claims that are external to the debtor's capital structure and that become the basis
> for making a claim against the debtor for damages associated with the purchase or
> sale of securities of its affiliate.
>
>     Accordingly, claims represented by affiliate securities rarely would seek to
> recover amounts claimed by investors (exceptions would be when the debtor has
> guaranteed payment or the estates are consolidated).  Instead, as in the situations
> described in this opinion, the claim represented by the securities of LBHI is an
> unsecured claim for damages or for reimbursement relating to the purchase or sale
> of such securities.

Lehman Bros. Inc., 503 B.R. at 787 (emphasis added).

The Bankruptcy Court declined to consider Congressional intent or legislative history, holding that the statute was unambiguous and capable of construction "without resorting to background sources."  Id. at 786.  Instead, the Bankruptcy Court proceeded to enter the Order, providing that the JU Claims "are hereby subordinated to all allowed unsecured general creditor claims against LBI."  Order at 2.  Because general creditor claims are not expected to be paid in full, subordination of the JU Claims effectively means that there will be no recovery or distribution to the Junior Underwriters.

The Junior Underwriters timely filed a notice of appeal on February 14, 2014.  See ECF No. 1 (S.D.N.Y. Mar. 21, 2014).

## ARGUMENT

### A.  The Bankruptcy Court's Interpretation of Section 510(b) is Erroneous

The scope of this appeal turns on a narrow question of statutory interpretation: specifically, what is the proper meaning of the phrase "the claim or interest represented by such security" for the purposes of Section 510(b) of the Bankruptcy Code.

As the Trustee correctly noted below, "[t]he policy behind Section 510(b) was 'to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding.'"  Objection ¶ 25 (quoting In re Enron Corp., 341 B.R. 141, 158 (Bankr. S.D.N.Y. 2006)).  Accordingly, Section 510(b) provides:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

11 U.S.C. § 510(b) (emphasis added).

Section 510(b) is best understood in two parts. The first part of Section 510(b) identifies the type of claims that potentially fall within its scope. Claims "arising from rescission of a purchase or sale of a security of the debtor or an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution . . . on account of such a claim" are potentially subject to subordination. These "arising-from" claims sound in tort as well as contract and are different from claims or interests based solely on the <u>ownership</u> of a security. If an investor claimant re-characterizes his "ownership" claim as one for rescission, damages, or contribution related to the purchase or sale of his security, the claim falls within the ambit of Section 510(b). There is no dispute that the JU Claims are arising-from claims – claims for contribution on account of damages arising from the purchase or sale of LBHI securities – within the meaning of the first prong of the statute.

But Section 510(b) does not stop there. Subordination is inherently a relative concept – a claim can only be subordinated <u>to</u> another claim. For this reason, the second part of the section expressly designates the claims, if any, to which an arising-from claim may be subordinated. Namely, the claims arising from the purchase or sale of a security are subordinated to those claims "that are senior to or equal the claim or interest represented by such security."

Here, as the Bankruptcy Court recognized, there are no claims "represented" by LBHI securities in the LBI SIPA proceeding in the traditional sense of the word – that is, no claims based on ownership of LBHI securities. See <u>Lehman Brothers Inc.</u>, 503 B.R. at 786-87. LBI neither issued nor guaranteed the LBHI securities, and the Chapter 11 proceedings of LBHI are distinct from the SIPA proceeding for LBI.

Unable to thus apply the plain text of the statute, the Bankruptcy Court instead held, in circular fashion, that the JU Claims could serve both as claims arising from the purchase or sale

of a security, and claims represented by such security.  "The 'claims . . . represented by such security.'" it ruled, "are the claims of the [Junior] Underwriters for reimbursement and contribution (and not for recovery on account of the LBHI securities themselves)."  Id.   In other words, the Bankruptcy Court held that the Junior Underwriter's claims may be subordinated to themselves, regardless of the priority – or even presence – of claims based on the ownership of the underlying LBHI securities.

This interpretation of Section 510(b) conflicts with plain reading of the text, runs afoul of the other relevant cannons of statutory construction, and is unclear and unworkable in practice. The Court should reject it in favor of the ordinary understanding that a "claim or interest represented by such security" is a claim based on the ownership of "such security".

1. The Bankruptcy Court's Interpretation of Section 510(b) is at Odds with the Cannons of Statutory Construction

The Bankruptcy Court's interpretation of the words "claim or interest represented by such security" is contrary to the ordinary meaning afforded those words.  See Levin v. United States, – U.S –, 133 S.Ct. 1224, 1231 (2013) ("In determining the meaning of a statute, we look first to its language, giving the words their ordinary meaning." (internal quotation marks omitted)).  In ordinary language, to say that a claim or interest is "represented by" a security means that such claim is based on an assertion of the rights to payment concomitant to ownership of that security. See Webster's Third International Dictionary of the English Language Unabridged 1926 (16th ed. 1971) (defining "represent" to mean "to correspond to in kind"); Merriam-Webster, http://www.merriam-webster.com/dictionary/represent (last visited Apr. 25, 2014) ("to correspond to in essence: Constitute" (emphasis added)).  In contrast, one would not ordinarily describe claims derived from the purchase or sale of a security as being "represented by" the security itself because absent more, the security does not give rise to any such claim.  Instead,

one would relate those claims to the offending <u>transaction</u>.  Congress did just this when it described these transaction-based claims as "arising from the purchase or sale of such a security."  There is no basis to suppose that Congress would, in the same sentence, have also described these claims as "represented by" by a security.

Indeed, the Bankruptcy Court's interpretation of Section 510(b) offends the presumption that variations in statutory language are meaningful.  <u>See</u> <u>United States v. Fisher</u>, 6 U.S. 358, 388 (1805) (Marshall, CJ.) (observing that a "change of language strongly implies an intent to change the object of legislation"); <u>Hirt v. Equitable Ret. Plan</u>, 533 F.3d 102, 108 (2d Cir. 2008) ("[W]e refrain from concluding here that the differing language in the two subsections has the same meaning in each.  We would not presume to ascribe this difference to a simple mistake in draftsmanship." (quoting <u>Russello v. United States</u>, 464 U.S. 16, 23 (1983))).  The statute defines the categories of claims potentially subject to subordination as those "arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution . . . on account of such a claim."  Congress then used different language – claims "represented by such security" – to describe the level to which claims could be subordinated.  This dichotomy plainly indicates an intent to refer to a different type of claim.

Moreover, it is a "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant." <u>Kungys v. United States</u>, 485 U.S. 759, 778 (1988); <u>see also</u> <u>Colautti v. Franklin</u>, 439 U.S. 379, 392 (1979) (referencing the "elementary canon of construction that at statute should be interpreted so as not to render one part inoperative").  But the Bankruptcy Court's interpretation of the second part of Section 510(b) renders the words "represented by such security" superfluous.  If Congress had intended to subordinate arising-

11

from claims to themselves, it would have had no cause to modify the word "claim" the last time it is used in the sentence with the term "represented by such security." Arising-from claims are already defined in the first part of Section 510(b) and are subsequently referred to as "such a claim." It makes no sense that Congress would add new modifiers the third time it referred to these claims in the sentence if, as the Opinion holds, the same claims are at issue.[5]

It is thus unsurprising that for the purposes of Section 510(b), neither courts nor commentators have indicated that "the claim or interest represented by such security" was anything other than a claim based on ownership of the security. See, e.g., In re Med Diversified, 461 F.3d 251, 254, 259 (2d Cir. 2006) (affirming the district court's decision to subordinate a claim arising from the failed exchange of the debtor's common stock to the same priority as that stock); In re Enron Corp., 341 B.R. 141, 149 (Bankr. S.D.N.Y. 2006) (recognizing that the subordination of claims arising from the failure to exercise options on the debtor's stock would cause those claims to have the same priority as equity); In re Jacom Comp. Services, 280 B.R. 570, 571, 573 (Bankr. S.D.N.Y. 2002) (directing that subordinated claims arising from the sale of the debtor's common stock be estimated "at zero" because they would have the same priority as equity); 16 Collier on Bankruptcy 510.04(1) (2013) ("If the security is an unsecured debt instrument, the claim that is represented by that security is a general, unsecured claim. Since the claim represented by the instrument is a general, unsecured claim, any claim for rescission will be subordinated until the claims of the general unsecured creditors have been satisfied."); Robert

---

[5]      Importantly, it is not the case, as the Bankruptcy Court suggested, see In re Lehman Brothers Inc., 503 B.R. at 785, that the Appellants' interpretation of the statute renders superfluous the statute's reference to securities of a debtor's affiliate. Instead, this interpretation simply limits Section 510(b)'s application to circumstances where claims represented by the affiliate security are present in the debtor's capital structure, which, as the Bankruptcy Court itself recognized, can occur "when the debtor has guaranteed payment or the estates are consolidated." Id. at 787.

J. Stark, Reexamining the Subordination of Investor Fraud Claims in Bankruptcy: A Critical Study of In re Granite Partners, L.P., 72 Am. Bankr. L.J. 497 (1998) (noting that Section 510(b) "appears to distinguish claims based on fraud stemming from the purchase or sale of a security from all other creditor claims and to treat them, for the purpose of distribution priority, as below or equivalent to the rights afforded by the underlying security.").[6]

> 2. The Bankruptcy Court's Interpretation of Section 510(b) is Unclear and Unworkable in Practice

Given that the words "claim or interest represented by such security" have been generally understood to mean claims or interests based on the ownership of a security, the Bankruptcy Court could not fully jettison that approach. Instead, it opined that "[t]he words may have different meanings depending on whether a claim relates to a security of the debtor or a security issued by an affiliate of the debtor." Lehman Bros. Inc., 503 B.R. at 787. That is, when the arising-from claims relate to the debtor's securities, those claims should be subordinated to claims based on ownership of those securities, but that, when the arising-from claims relate to the securities of an affiliate of the debtor, the claims should be subordinated to themselves. Id. In the next paragraph, however, the Bankruptcy Court appeared to reformulate its interpretation, implying that arising-from claims should only be subordinated to themselves where there are no ownership claims pending against the debtor. See id.

There is no basis whatsoever in the text of the Bankruptcy Code to hold that the words "represented by such security" have totally different meanings depending on whether the securities at issue are securities of a debtor or a debtor's affiliate. Indeed, the Bankruptcy Court's holding that the clause "represented by such security" is "subject to interpretation within

---

[6]     The only arguable exception to this is In re VF Brands, Inc., 275 B.R. 725 (Bankr. D. Del. 2002). But, as discussed further below, the court in VF Brands subordinated the arising-from claim to itself only by misquoting the relevant statutory text.

the text" in this way, id., is at odds with its insistence that the statute is clear and unambiguous, see, e.g., id. at 780, 784,786-87.

Even if there were a textual basis for the Bankruptcy Court's distinction between debtor and debtor-affiliate securities, its holding proves impossible to apply in practice. Specifically, the Bankruptcy Court's distinction can only be consistently applied where owners of securities issued by an affiliate have no direct claims against the debtor based on ownership of the security. But this is not always the case. As the Bankruptcy Court itself recognized, claims based on ownership of an affiliate's securities arise in at least two distinct situations: (1) where the debtor has guaranteed payment on its affiliates securities; or (2) where both the debtor and its affiliate are bankrupt and the two estates are substantively consolidated. See id. at 787. In either scenario, it is unclear from the Bankruptcy Court's decision which interpretation of the second part of Section 510(b) should control.

And yet, the dueling interpretations produce meaningfully different results. For example, an arising-from claim may relate to the purchase of a senior note issued by an affiliate of the debtor but entitled to a senior guarantee from the debtor. Section 510(b) directs that such arising-from claim be subordinated below "the claim or interest represented by such security." If the claim "represented by such security" is an ownership claim, the claim has the relative priority of a senior note, and therefore the arising-from claim would be subordinated to senior unsecured claims, but not general unsecured claims. If, on the other hand, the claim "represented by such security" is the arising-from claim itself, it is a general unsecured creditor claim, and so the arising from claim would be subordinated to all general unsecured claims against the debtor. According to the Opinion, both of these results are correct. No reasonable interpretation of Section 510(b) would create such inconsistency.

3.   The *Claim or Interest Represented by Such Security*
     Means Only Claims Based Solely on Ownership of a Security

For the reasons described above, it is clear that, for the purposes of Section 510(b), "the claim or interest represented by such security" must be (1) something different from the arising-from claim itself; and (2) specifically, a claim based solely on the ownership of the security whose purchase or sale relates to the arising-from claim.  This interpretation flows from plain meaning of the text, is logical and consistent, and, unlike the Bankruptcy Court's construction, gives full effect to all of the words of the statute.

That this meaning is clear from face of the statute is not surprising because it is also the one that Congress intended for the words to have.[7]  The House Report on the 1978 Bankruptcy Reform Act confirms that the second part of Section 510(b) is exclusively focused on the relationship between arising-from claims and claims based on ownership of the related security. It explains that:

> [t]he bill subordinates in priority of distribution rescission claims to all claims that
> are senior to the claim or interest on which the rescission claims are based.  Thus,
> a rescission claim resulting from the purchase of a subordinated debenture would

---

[7]   Even if the text of Section 510(b) were not clear on its face, the proceedings below show that it is, at a minimum, ambiguous when applied to the Junior Underwriters' claims. See In re Lernout & Hauspie Speech Prods., N.V., 264 B.R. 336, 341 (Bankr. D. Del. 2001) (determining that the second part of Section 510(b) is ambiguous in the context of arising-from claims related to an affiliate's securities).  Indeed, the Bankruptcy Court seemed to recognize this ambiguity during oral argument on the Objection, remarking that the "510(b) issue" was "really not plain vanilla," and that there was a "lack of obvious symmetry" between the first and second parts the section when the arising-from claims related to the securities of the debtor's affiliate.  See Hr'g Tr. 9.  The Bankruptcy Court also observed "that we're looking at today some fairly opaque language in 510(b)," see id. at 12, and, in fact, toyed with numerous alternative interpretations of the second part of the section, see, e.g., id. at 25 ("Well couldn't you, just to be a creative thinker here, couldn't you conclude that the only way to make logical sense out of this is that there's a virtual security, in effect if the security of the affiliate were a security of the debtor then the claim represented by such security would be an unsecured claim, and so you would then subordinate to that hypothetical security.").  When the text of a statute is not clear, courts may consult legislative history.  United States v. Kozeny, 541 F.3d 166, 171 (2d Cir. 2008).

> share in the proceeds of the estate before equity security holders but after general
> unsecured creditors.

H.R. Rep. No. 95-595, at 196 (1977).

House Report 595's reference to "the claim or interest <u>on which the rescission claims are</u> <u>based</u>" makes clear that Congress did not intend for arising-from claims to be subordinated to themselves.  Instead, it intended for them to be subordinated to the claims or interests (for debt or equity, respectively) represented by ownership of the underlying security.  The example that the House Report provides makes this clear.  While the text of the statute alone compels the Appellants' interpretation of the statute, its legislative history serves only to confirm the point.

**B.     Under the Proper Interpretation of Section 510(b) the Junior Underwriters' Claims Are Not Subject to Subordination**

Once Section 510(b) is correctly interpreted to only require subordination of arising-from claims to claims based solely on the ownership of the underlying securities that gave rise to the claim, it is clear that the JU Claims should not be subordinated.  LBI underwrote the securities at issue in the course of its business as a broker dealer.  While the underlying securities here happen to be those of a former affiliate, LBHI, the securities – just like the securities of unaffiliated issuers whose public offerings LBI underwrote, which undisputedly fall outside the scope of Section 510(b) – remain unrepresented by any claim or interest in LBI's SIPA proceeding.  Nor do the JU Claims implicate Section 510(b)'s two policy justifications: (i) the Junior Underwriters never took on the risk and return expectations of an investor; and (ii) the Junior Underwriters do not seek to recover a contribution to the equity pool.  Properly read, Section 510(b) does not allow for the type of arbitrary subordination the Bankruptcy Court imposed.

16

1. <u>Section 510(b) Does Not Apply to the Junior Underwriters' Claims Because There Are No Claims or Interests *Represented by* LBHI Securities Pending Against LBI</u>

As discussed above, Congress passed Section 510(b) to prevent investors at or near the bottom of a debtor's priority structure, or "waterfall," from re-characterizing their ownership claims as tort or breach of contract claims in order to bootstrap their way into the relatively senior class of general unsecured creditors.  The statute ensures that the unsecured claims pool is not improperly diluted, by subordinating the arising-from claim in appropriate circumstances.  In this way, claims based on ownership of an unsecured note would remain senior to tort or contract claims arising from the purchase or sale of that note.

For this system to work – and the statute to apply – the security whose purchase or sale gave rise to the subordinated claim must represent claims or interests in the same bankruptcy proceeding.  If there are no claims "represented by such security" in the debtor's capital structure, the court has nothing to which it can subordinate the rescission, damages, or contribution claims, and Section 510(b) cannot apply by its literal terms.[8]  <u>See</u> <u>United States v. Ron Pair Enterprises, Inc.</u>, 489 U.S. 235, 241 (1989) (where a "statute's language is plain, 'the sole function of the courts is to enforce it according to its terms'" (quoting <u>Caminetti v. United States</u>, 242 U.S. 470, 485 (1917))).

Such is the case here.  The JU Claims are for contribution "on account of" claims for damages made by the plaintiffs in the Actions, and those damages claims arose from the

---

[8]    The Trustee implicitly recognized this disconnect in a subsequently filed objection, wherein he argued that Section 510(b) applied to claims arising from the purchase or sale of LBHI securities but was unable to specify the level to which such claims should be subordinated.  <u>See</u> The Trustee's One Hundred Thirty-First Omnibus Objection to General Creditor Claims (Employee Equity Claims) (Dkt. No. 7158) ¶ 23 n.9,  <u>In re Lehman Bros. Inc.</u>, No. 08-1420 (JMP) (SIPA) (Bankr. S.D.N.Y. Aug. 29 2013) ("The Trustee takes no position as to the validity, value, or level of priority of subordinated and reclassified Accrued Equity Claim at this time and reserves the right to raise arguments as to these issues should the need arise.").

purchase or sale of LBHI securities.  But, this is an appeal from a proceeding for the liquidation solely of <u>LBI</u>, where there are no claims or interests represented by any LBHI securities, as the Trustee has emphasized throughout the claims resolution process.  <u>See, e.g.</u>, The Trustee's One Hundred Thirty-First Omnibus Objection to General Creditor Claims (Employee Equity Claims) (Bankr. Dkt. No. 7158) ¶ 4, <u>In re Lehman Bros. Inc.</u>, No. 08-1420 (JMP) (SIPA) (Bankr. S.D.N.Y. Aug. 29, 2013) (seeking to disallow a claim based on LBHI stock as "represent[ing] an equity interest in LBHI, not LBI, the debtor in this separate and distinct proceeding").  If the JU Claims were asserted against LBHI in LBHI's bankruptcy proceeding, those claims would be rightly subordinated under Section 510(b).  <u>See</u>  <u>In re Jacom Comp. Servs.</u>, 280 B.R. at 571-72 (subordinating claims for indemnification based on the underwriting of the <u>debtor's</u> securities).  Yet, as the JU Claims are against LBI, not LBHI, there are no claims or interests in this case to which the JU Claims can be subordinated.  Section 510(b) simply does not apply here.

Courts that have sought to apply Section 510(b) in the absence of any claims "represented" by the underlying security have invariably done violence to the text of the statue.  The court in <u>In re VF Brands, Inc.</u>, 275 B.R. 725 (Bankr. D. Del. 2002), for example, arrived at the same result of as the Bankruptcy Court below – i.e. it subordinated the arising-from claims to themselves – only by misquoting Section 510(b).  It replaced the words "senior to or equal to the claim or interest represented by such security," with "'senior or equal to' the claims <u>of Money's Trust</u> [the claimant in that case]," 275 B.R. at 727 (emphasis added).  Thus, the court never interpreted the meaning of "represented by such security" because it simply read those words out of the statute.  The Bankruptcy Court's Opinion nonetheless relied on <u>VF Brands</u> without explaining this fundamental omission.

Similarly, in In re William James Del Biaggio III, the court appeared to take the position that, although there were no actual claims or interests "represented by such security" pending against the debtor, the claimant's arising-from claims should nevertheless be subordinated to phantom ownership claims fictionally located at the bottom of the waterfall.  See No. 12-CV-6447, 2013 WL 6073367, *7 (N.D. Cal. Nov. 18, 2013) ("Under Section 510(b), Freeman's claim could not have a greater priority to the Del Biaggio estate than the security from which his claim arises.  Shares in a subsidiary or affiliate do not give rise to a claim directly against the assets of a parent company.").[9]  In this way, Del Biaggio suggests that precisely because there are no legitimate claims or interests "represented by such security", the arising-from claim would be subordinated to non-existent – and therefore valueless – claims.  Section 510(b) provides no basis for this "less-than zero" approach, which is as flawed conceptually as it is textually.  If, in a counter-factual world, someone had brought claims represented by an affiliate's security that did not convey any rights against the debtor's estate, those claims would not have been at the bottom of the waterfall; they would have been disallowed and so would still not exist.  Subordination in these circumstances is impossible; because subordination is a relative concept, something may not be subordinated to nothing.  Application of Section 510(b) would thus amount to disallowance rather than subordination.  See In re Lernout & Hauspie Speech Prods., N.V., 264 B.R. 336, 343 (Bankr. D. Del. 2001) ("Such a reading of the provision would convert the term 'subordinate', as used in § 510(b), into 'disallow'.");[10] cf. In re Lightsquared, Inc., 504 B.R. 321,

---

[9]     An appeal from the Del Biaggio decision remains pending.  See In re William James Del Biaggio III, No. 13-17500 (9th Cir. Dec. 9, 2013) (docketing letter (Dkt. No. 1-5)).

[10]    Notwithstanding its refusal to subordinate the arising-from claims to less-than zero, the Lernout & Hauspie court did subordinate the arising-from claims to the general unsecured claims.  See 264 B.R. at 344.  It had no occasion to fit this result into the textual framework of Section 510(b), however, as the claimants acceded to such subordination.  See id. at 343.

342 (Bankr. S.D.N.Y. 2013) (holding that claims may not be equitably disallowed under the parallel subordination provisions of Section 510(c) of the Bankruptcy Code).

2. <u>Subordination of the Junior Underwriter Claims Conflicts with the Policy Underlying Section 510(b)</u>

The Bankruptcy Court refused to consider the policy behind Section 510(b), repeatedly maintaining in <u>ipse</u> <u>dixit</u> fashion that the second part of the section is clear on its face. <u>See, e.g.</u>, <u>Lehman Bros. Inc.</u>, 503 B.R. at 780, 784,786-87. But the text of Section 510(b) is contrary to its interpretation; or, as noted above, <u>see</u> <u>supra</u> note 7, is at the very least ambiguous. Had the Bankruptcy Court acknowledged the well-known legislative policies underpinning Section 510(b), it would have been forced to confront the utterly arbitrary effect of its ruling.

As the Second Circuit has recognized, Congress had only two rationales for requiring subordination under Section 510(b), to which any interpretation of that statute must "conform": first, Section 510(b) aims to protect "the dissimilar risk and return expectations of shareholders and creditors;" and, second, it supports "the reliance of creditors on the equity cushion provided by shareholder investment." <u>In re Med Diversified</u>, 461 F.3d at 256; <u>see also</u> <u>id.</u> ("Because there are only two rationales for mandatory subordination expressly or implicitly adopted by the Congress that enacted Section 510(b), we conform our interpretation of the statute to require subordination here only if [claimant] (1) took on the risk and return expectations of a shareholder, rather than a creditor, or (2) seeks to recover a contribution to the equity pool"); <u>In re Betacom of Phoenix</u>, 240 F.3d 823, 827 (9th Cir. 2001) (noting that Congress passed Section 510(b) to protect general unsecured creditors from having their recoveries diluted when they expected to have rights senior to equity shareholders); Objection ¶ 25 ("The policy behind enacting Section 510(b) was 'to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with

20

general unsecured creditors in a bankruptcy proceeding.'" (quoting In re Enron Corp., 341 B.R. at 158)).  Because neither one of these policy interests is served by the subordination of the Junior Underwriters' claims – and because, in fact, subordination would work the exact type of unfair discrimination among creditors that Congress sought to eliminate by enacting the statute – Section 510(b) does not apply in this case.

In Med Diversified, the Second Circuit examined Section 510(b)'s "legislative history, contained principally in the House Report on the 1978 Bankruptcy Reform Act, and . . . the journal article that motivated the promulgation of the statute."  461 F.3d at 255.  House Report 595, independently and by its express reliance on the journal article, The Interface Between Securities Regulation and Bankruptcy – Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors by John J. Slain and Homer Kripke ("Slain & Kripke"), 48 N.Y.U. L. Rev. 261 (1973), makes clear that Congress passed Section 510(b) to ensure "that the risk of illegality in securities issuance should be borne by those investing in securities and not by general creditors" who have "not had the potential benefit of the proceeds of the enterprise deriving from ownership of the securities . . .." H.R. Rep. No. 95-595, at 195[11]

Clearly, the motivating force behind the section's enactment was Congress's concern about the fair treatment in bankruptcy proceedings of creditors vis-à-vis investors.  If an investor claimant re-characterizes his claim as one for rescission, damages, or contribution related to the purchase or sale of his security, the claim is subordinated to "all claims or interests that are

---

[11] This rationale directly reflects the policy concerns that motivated  Professors Slain an Kripke to write their article.  See Slaine & Kripke, 48 N.Y.U. L. Rev. at 263 ("In this article, we question the basic wisdom of treating rescission claims any differently from equity claims in bankruptcy cases.  It is our thesis that the present approach is wrong and that the problem should be reconceptualized as one of risk allocation.  In our view, in any such allocation one interest should be weighted far more heavily than at present:  the reliance interest of persons having the normal expectation that equity investment and junior debt will bear the first losses of the enterprise.").

senior to or equal the claim or interest represented by such security."  The statute knocks down the would-be bootstrapper in priority to below where he would have been had he simply based his claim on his ownership of the security.

But, where there is no remaining investor claimant in a bankruptcy proceeding, the investor – versus – creditor fairness concern that motivated Slaine and Kripke to write their article and, later, Congress to pass Section 510(b) is removed.[12]  Where all of the claimants are creditors, Congress did not provide for mandatory subordination.  Indeed, the Second Circuit warned courts to be vigilant against "attempts by a bankruptcy debtor to clothe a general creditor in the garb of shareholder."  See Med Diversified, 461 F.3d at 258.

The VF Brands decision, which the Bankruptcy Court's Opinion relied upon, serves only to illustrate this risk.  In VF Brands, the claimant, Money's Trust, filed a proof of claim sounding in contract and tort for damages arising from the acquisition of one of the debtor's former subsidiaries, Vlasic Farms, Inc.  See 275 B.R. at 726.  Vlasic Farms, having been spun-off, was not a debtor in the proceeding, and Money's Trust did not – and indeed could not – assert any claim based on its ownership of Vlasic Farms' stock.  See id.  Nevertheless, the court subordinated the claim to the level of the debtor's common stock.  In other words, Money's Trust, which never invested in the debtor and never shared the expectations of the debtor's shareholders, was treated as if it had been a common stockholder, while the other general

---

[12]    To be sure, ownership of the debtor's security is not a requirement for subordination under Section 510(b).  Indemnification claims of underwriters against bankrupt issuers have been properly subordinated under that section.  See, e.g., In re Jacom Comp. Servs., 280 B.R. at 572; In re Mid-Am. Waste Sys., Inc., 228 B.R. 816, 824-26 (Bankr. Del. 1999).  But – again – the securities at issue in the transactions related to the subordinated claims were those of the debtor, and thus "represented" claims or interests in the bankruptcy proceedings where the claims were filed.  That would be the result if this were the bankruptcy proceeding of LBHI.  But this is not that case; the JU Claims being adjudicated are asserted against LBI in its independent SIPA proceeding.

unsecured creditors – by virtue of the unjustified subordination of Money's Trust's claim – received a windfall.

As discussed above, the VF Brands court's attempt to ground this result in the text of the statute failed because it misquoted Section 510(b),[13] but the policy justification that the VF Brands court articulated for its ruling was even further afield.  The court correctly noted that "Congress intended to prevent disaffected equity investors from recouping their investment losses in parity with general unsecured creditors in the event of bankruptcy."  Id. at 728 (quoting In re Telegroup, Inc., 281 F.3d 133, 142 (3d Cir. 2002)).  However, it misapplied this rationale to Money's Trust's claims, stating that "to hold, as Money's Trust asserts, that it retains an unsubordinated general unsecured claim against [the debtor] for damages arising from its investment in Vlasic Farms would give it the best of both worlds – the right to share in profits if Vlasic Farms succeeded and the right to repayment as a creditor (from the [debtor]) if it failed."  VF Brands, 275 B.R. at 728.  But this is simply false.  Whatever equity risk was associated with Money's Trust's investment in Vlasic Farms was totally unrelated to the right it sought to vindicate in the debtor's bankruptcy proceeding.  Because Money's Trust never invested in the debtor, it had no "investment loss" to recoup through its general unsecured claim.  The VF Brands court thus conflated the parent debtor's identity with that of its former subsidiary in a way that makes no sense either legally or economically.[14]

---

[13]    Additionally, to the extent that the VF Brands court based subordination on the fact that Money's Trust's claim arose from the purchase or sale of common stock, see 275 B.R. at 727, it ignored the basic difference between the common stock involved in the transaction related to Money's Trust's claim and the common stock of the former parent that was represented in the bankruptcy proceedings.

[14]    While the Bankruptcy Court also cited to the Del Biaggio, that decision failed to so much as attempt to reconcile its results-driven subordination with the policy underlying Section 510(b). Indeed, Del Biaggio concerned an individual – rather than a corporate debtor, such that it was

Here, the Bankruptcy Court's ruling subjects the Junior Underwriters to the same arbitrary treatment as befell the claimant in <u>VF Brands</u>.  The Junior Underwriters are neither LBI shareholders nor LBI underwriters.  They were involved in the issuance of LBHI's securities, not those of LBI.  They did not expect or bargain to share in the rewards of LBI's success, and were mere contractual creditors of LBI, with whom they had a contractual relationship as co-underwriters.  Subordination in this case would undermine the policies underpinning Section 510(b).  Rather than fulfilling the relative expectations of LBI's creditors, investors, and underwriters, subordination of the Claims would arbitrarily discriminate against one class of general unsecured creditors in favor another, permitting the LBI estate to retain the benefits of its underwriting fees while evading claims that arose from those underwritings.

## <u>CONCLUSION</u>

For the foregoing reasons, the Junior Underwriters respectfully submit that the Court should reverse the Order of the Bankruptcy Court and remand the case for further proceedings consistent with that mandate.

Dated: April 25, 2014          CLEARY GOTTLIEB STEEN & HAMILTON LLP
      New York, New York

                                      By:    /s/ Luke A. Barefoot                
                                            Mitchell A. Lowenthal
                                            Luke A. Barefoot

                                        One Liberty Plaza
                                        New York, New York 10006
                                        Telephone: (212) 225-2000
                                        Facsimile: (212) 225-3999

                                        *Counsel for the Junior Underwriters*

---

legally impossible for the claimant to have shared the risk expectations of a shareholder or contributed to an individual's "equity pool."  <u>See</u> 2013 WL 6073367, *1-*3.