UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------- X

In re

LEHMAN BROTHERS INC.,

                    Debtor.

------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  9/5/14
```

**OPINION AND ORDER**

Appeals arising from SIPA
Liquidation Proceeding, Case
No. 08-1420.

              14-cv-1742(SAS)
              14-cv-1987(SAS)
              14-cv-2305(SAS)

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.  INTRODUCTION

       On September 19, 2008, Lehman Brothers Inc. ("LBI"), a registered

broker-dealer and wholly-owned subsidiary of Lehman Brothers Holdings Inc.

("LBHI"), was placed into liquidation pursuant to the Securities Investor

Protection Act of 1970 ("SIPA"), and James W. Giddens was appointed as SIPA

trustee (the "Trustee").  Before the Court are three related appeals from two orders

entered by Bankruptcy Judge James M. Peck in LBI's SIPA proceeding (the

"Orders").[1]  In relevant part, the Orders grant a motion and sustain an objection

---

      [1]    *See In re Lehman Brothers Inc.*, No. 08-1420 (JMP) (SIPA), Dkt.
Nos. 8176 and 8177; *In re Lehman Brothers, Inc.*, 503 B.R. 778 (Bankr. S.D.N.Y.
2014) ("Decision Below").

filed by the Trustee seeking to subordinate certain claims pursuant to section

510(b) of the Bankruptcy Code.  The Bankruptcy Court found that subordination of

the claims to the claims of general unsecured creditors was mandated under the

plain language of section 510(b).

Appellant Claren Road Credit Master Fund Ltd. ("Claren Road")

argues that its claim for damages against LBI, based on LBI's failure to purchase

bonds issued by LBHI from Claren Road pursuant to a prime brokerage account

agreement, should not be subordinated because it does not "aris[e] from the

purchase or sale" of the LBHI bonds within the meaning of section 510(b).[2]  In

addition, Claren Road and the remaining appellants, co-underwriters[3] with LBI in

the issuance of LBHI securities, argue that section 510(b) is inapplicable because

there are no claims or interests "represented by" LBHI securities in LBI's SIPA

---

[2]        *See* Opening Brief of Appellant Claren Road Credit Master Fund Ltd.
("Claren Road Mem."), Case No. 14-cv-1742, at 8-10 (quoting 11 U.S.C. §
510(b)); Reply Brief of Appellant Claren Road Credit Master Fund Ltd. ("Claren
Road Reply"), Case No. 14-cv-1742, at 3-5.

[3]        A joint appeal was filed by underwriters ANZ Securities, Inc.
("ANZ"), BMO Capital Markets Corp., BNY Mellon Capital Markets, LLC,
Cabrera Capital Markets, LLC, DNB Markets, Inc., BNP Paribas FS, LLC,
nabSecurities, LLC, National Australia Bank Ltd., SunTrust Robinson Humphrey,
Inc. and The Williams Capital Group, L.P.  I will refer to these underwriters
collectively as "ANZ."  Underwriter UBS Financial Services Inc. ("UBSFS") is
represented by separate counsel and has filed a separate appeal.  I will refer to
UBSFS and ANZ collectively as the "co-underwriters."

proceeding.[4]  For the reasons set forth below, the Orders are AFFIRMED.

## II.    BACKGROUND

### A.    Claren Road

#### 1.    Claren Road's Claim

In December 2005, Claren Road and LBI entered into a prime brokerage agreement.[5]  The PBA deems LBHI and certain LBHI affiliates as parties and is signed by LBI "as signatory for itself and as agent for the affiliates named herein."[6]  As prime broker, LBI agreed to "'settl[e] trades executed on [Claren Road's] behalf by [its] executing broker(s).'"[7]  On September 12, 2008, LBI and Claren Road entered into two separate trades in which LBI agreed to purchase LBHI bonds from Claren Road at a discount to par.  LBI breached its agreement to purchase the LBHI bonds on September 17, 2008, when it failed to

---

[4]    Opening Brief of Appellant UBS Financial Services Inc. ("UBSFS Mem."), Case No. 14-cv-2305, at 1 (quoting 11 U.S.C. § 510(b)); Opening Brief of Junior Underwriter Appellants ("ANZ Mem."), Case No. 14-cv-1987, at 3 (same).

[5]    *See* Claren Road Mem. at 4; Customer Account Agreement Prime Brokerage ("PBA"), Ex. 2 to 3/26/14 Declaration of Joshua Weisser, counsel to Claren Road, in Support of Opening Brief of Appellant Claren Road Credit Master Fund Ltd.

[6]    PBA at 1, 11.

[7]    Claren Road Mem. at 5 (quoting PBA ¶ 21(b)).

settle the trades.  Claren Road filed a claim against LBI in the SIPA liquidation for

over $8.5 million, representing the difference between the amount that LBI had

agreed to pay for the LBHI bonds and their market price on September 19, 2008.[8]

### 2. The Trustee's Motion and the Bankruptcy Court's Order

On October 25, 2013, the Trustee filed a motion seeking to confirm

the non-customer status[9] of Claren Road's claim under SIPA and to subordinate it

to the claims of general unsecured creditors pursuant to section 510(b).[10]  Claren

Road argued that on a literal reading of section 510(b), its claim does not arise

from a purchase or sale of a security because LBI did not complete the purchase of

---

[8]    *See id.*

[9]    Congress enacted SIPA in response to customer losses that resulted
from stockbroker failures in 1969 and 1970.  The purpose of SIPA is "to protect
individual investors from financial hardship; to insulate the economy from the
disruption which can follow the failure of major financial institutions; and to
achieve a general upgrading of financial responsibility requirements of brokers and
dealers to eliminate, to the maximum extent possible, the risks which lead to
customer loss."  S. Rep. No. 1218, 91st Cong., 2d Sess., at 4 (1970).  To effectuate
this purpose, "a fund of 'customer property' is established [] consisting of cash and
securities held by the broker-dealer . . . for priority distribution exclusively among
customers," and "[t]he Trustee allocates the customer property so that customers
'share ratably in such customer property . . . to the extent of their respective net
equities.'"  *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 85 (2d Cir. 2014)
(quoting 15 U.S.C. § 78fff-2(c)(1)(B)).

[10]    *See* Decision Below, 503 B.R. at 781.

the LBHI bonds.[11]  It further argued that under Second Circuit case law, section

510(b) is ambiguous when applied to its claim and that subordination of its claim

would not further the policy objectives underlying the statute.[12]  The Bankruptcy

Court held that under the plain language of the statute, Claren Road's claim was

subject to subordination as a claim arising from the purchase or sale of a security

---

[11]     *See* Claren Road Mem. at 8 ("Although section 510(b), by its terms, is limited to claims "arising from the purchase or sale" of a security of the debtor or an affiliate of the debtor, no such 'purchase or sale' occurred in connection with the Claren Road Claim.  The Claim arises out of the *absence* of a purchase or sale, caused by LBI's *failure* to consummate the purchase to which it had agreed, thereby breaching its contract with Claren Road.") (emphasis in original).

[12]     *See* Decision Below, 503 B.R. at 781.  A number of facts relevant to consideration of these policy rationales are not included in the record, such as what business Claren Road is engaged in, when and for what purpose it purchased the LBHI bonds, whether the LBHI bonds were freely tradeable, etc.  In this regard, it is unclear why these appeals come to this Court on the Trustee's motion/objection and not in the context of an adversary proceeding in which the factual record could have been more fully developed.  *See* Fed. R. Bankr. P. 7001(8) (stating than an adversary proceeding must be brought "to subordinate any allowed claim or interest, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for subordination); *but see Lernout & Hauspie Speech Prods., N.V. v. Baker (In re Lernout & Hauspie Speech Prods, N.V.)*, 264 B.R. 336, 339-40 (Bankr. D. Del. 2001) (explaining that Rule 7001(8) "appears to limit subordination complaints to allowed claims," and, in any event declining to elevate form over substance where there had been due process).  While the parties have not challenged the Bankruptcy Court's decision on procedural grounds, the Trustee raises a number of fact-based arguments.  *See, e.g.*, Brief for the Appellee Trustee, Case No. 14-cv-1742, at 2, 19.  Ultimately, however, the absence of factual findings by the Bankruptcy Court does not impact this Court's holdings.

of a debtor affiliate.[13]  The Bankruptcy Court also rejected Claren Road's argument

that because section 510(b) states that an arising from claim "shall be subordinated

to all claims or interests that are senior to or equal *the claim or interest represented*

*by such security*," claims based on LBHI bonds may not be subordinated in LBI's

SIPA proceeding where holders of LBHI bonds have *no claims* against LBI's

estate.[14]  The Bankruptcy Court explained that

> Claren Road's approach is too narrow and fails to recognize the
> common meaning of the words used in the statute.  A more
> reasonable interpretation of the statutory language is that the
> "claim . . . represented by [the LBHI Bonds]" is not directed to a
> recovery from LBI on account of the LBHI Bonds but extends to
> the breach of contract claim asserted by Claren Road against LBI
> with respect to these bonds.  Such a claim is a general unsecured
> claim that is connected to the subject matter of the securities in
> question.  The essence of the claim is the failure to purchase the
> LBHI Bonds.  This reading of the plain language of the statute
> leads to the conclusion that the Claren Road Claim "shall be
> subordinated to all claims . . . that are senior to or equal" the
> general unsecured claims against LBI.
>
> Interpreting the phrase "claim or interest *represented*
> *by such security*" in this fashion is a common sense interpretation
> of section 510(b) that infuses the words of section 510(b) with
> meaning.  If a claim "represented by such security" were to be
> restricted to a recovery from the issuer for amounts outstanding
> under the security, then no claim arising from the purchase or sale

---

[13]   *See* Decision Below, 503 B.R. at 783-84.

[14]   11 U.S.C. § 510(b) (emphasis added); *see* Decision Below, 503 B.R.
at 784.

> of *affiliate* securities would ever fit within the regime for subordination. Such a result would contradict express provisions of the statute which direct that such claims shall be subordinated.[15]

The Bankruptcy Court entered an order allowing Claren Road's claim as a non-customer claim in its asserted amount, and subordinated that claim to the claims of general unsecured creditors.

### B.    The Co-underwriters

#### 1.    ANZ

In the course of its business as a broker-dealer, LBI served as lead underwriter in connection with offerings of registered securities issued by LBHI.[16] LBI and ANZ entered into a Master Agreement Among Underwriters dated December 1, 2005, which governed the relationship among the underwriters.[17] "The agreement required each underwriter to contribute, based on its agreed percentage participation in an offering, toward losses or liabilities incurred by another underwriter arising from allegations that the offering materials contained

---

[15]    Decision Below, 503 B.R. at 784 (alterations and emphasis in original).

[16]    *See* ANZ Mem. at 5 (noting that between 2006 and 2008, LBI was the largest underwriter of offerings of registered securities issued by LBHI).

[17]    *See id.*

7

untrue statements or omissions."[18]

After LBHI's collapse, a number of purchasers of LBHI securities filed lawsuits, including class actions, against ANZ.[19]  LBI was not named as a defendant because of the bar created by the automatic stay under section 362. These actions alleged that LBHI's offering documents contained material misstatements and omissions and sought to hold ANZ liable for damages under federal securities laws.[20]  ANZ's legal fees and settlement payments came to nearly seventy-eight million dollars and ANZ filed claims in LBI's SIPA proceeding based on asserted contractual and statutory rights to contribution.

### 2.  UBSFS

Pursuant to a purchase agreement entered into by UBSFS and LBI in 2007, "[i]n 2007 and 2008, UBSFS purchased from LBI, in LBI's capacity as underwriter, certain notes, including certain Medium Term Notes, Series I, U.S. Structured Notes issued by LBI [ ], expressly earmarked for sale to UBSFS

---

[18]     Decision Below, 503 B.R. at 781.

[19]     ANZ Mem. at 5.  These suits were consolidated in a securities class action in this district captioned *In re Lehman Brother Equity/Debt Securities Litigation*, No. 08-cv-5523 (the "Class Action").

[20]     *See id.* at 5-6.

clients."[21]  There were approximately eighty-four issuances of the LBHI notes

pursuant to the parties' agreements.  UBSFS did not purchase or hold any of the

notes for its own account.[22]  Following the commencement of LBI's SIPA case, a

number of UBSFS clients filed class action lawsuits or initiated arbitration

proceedings against UBSFS, asserting securities fraud and related claims based on

alleged material misstatements and omissions in the offering materials concerning

the LBHI notes.[23]  UBSFS filed a claim for over two hundred and fifty million

dollars based on its statutory right to contribution.[24]

### 3.    The Trustee's Objection and the Bankruptcy Court's Order

On July 12, 2013, the SIPA Trustee filed an objection to the

underwriter claims arguing that such claims should be subordinated under section

510(b).  The co-underwriters argued that their claims could not be subordinated

"because the LBHI securities do not represent a claim that can be made in the LBI

case."[25]  The Bankruptcy Court rejected the co-underwriters' "hyper-technical"

---

[21]    UBSFS Mem. at 3.

[22]    *See id.*

[23]    *See id.* at 4.  Some of these actions were consolidated in the Class
Action.

[24]    *See id.* at 5.

[25]    Decision Below, 503 B.R. at 786-87.

focus "on what it means for claims to be represented by securities of an affiliate of the debtor," disagreeing that "the claims must be based on securities within the capital structure of an enterprise that includes a debtor and affiliated entities."[26] The Bankruptcy Court explained that this rested on "the false premise [ ] that the claims represented by the securities of an affiliate of the debtor must be the same kinds of claims that could be made by a holder of those securities against that affiliate" and concluded that the co-underwriters' claims "are simply claims for reimbursement and contribution based on the sale of securities of LBHI, an affiliate of the debtor, and such claims do not rank equally with other unsecured claims against LBI.[27]  In reaching this conclusion, the Bankruptcy Court relied on the plain language of the statute and therefore did not consider legislative history or any other external material.

## III.   LEGAL STANDARD

A district court functions as an appellate court in reviewing orders entered by bankruptcy courts.[28]  Findings of fact are reviewed for clear error,[29]

---

[26]     *Id.* at 787.

[27]     *Id.*

[28]     *See In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir. 1993).

[29]     *See* Fed. R. Bankr. P. 8013.

10

whereas findings that involve questions of law, or mixed questions of fact and law, are reviewed de novo.[30]  A district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings."[31]

## IV.   APPLICABLE LAW[32]

Section 510(b), as amended in 1984, provides that

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.[33]

---

[30]    *See In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 52 (S.D.N.Y. 2003) (citing *In re United States Lines, Inc.*, 197 F.3d 631, 640-41 (2d Cir. 1999)).

[31]    Fed. R. Bankr. P. 8013.

[32]    SIPA incorporates section 510(b).  *See* 15 U.S.C. § 78fff(b); *Securities Investor Protection Corp. v. Stratton Oakmont, Inc.*, 229 B.R. 273, 279 (Bankr. S.D.N.Y. 1999) (citations omitted) (stating that "[a] SIPA Proceeding is essentially a bankruptcy liquidation" and noting that "SIPA incorporates chapters 1, 3, and 5 of title 11 (all of which are also applicable in a [bankruptcy liquidation]").  SIPA proceedings are initiated in the district court and then transferred to the bankruptcy court.  *See* 15 U.S.C. § 78eee(a)(3), (b)(4).

[33]    The 1978 version of section 510(b) provided:

Any claim for recission [sic] of a purchase or sale of a security of

Section 510(b) thus describes three categories of claims that are subject to mandatory subordination and then addresses how subordination is to occur.[34]  The two categories relevant here are claims (i) "for damages arising from the purchase or sale of [a security of the debtor or of an affiliate of the debtor]" and (ii) "for reimbursement or contribution . . . on account of such a claim[.]"[35]  With regard to the level of subordination, a leading treatise describes the operation of section 510(b) as follows:

> A shareholder claimant who seeks to rescind an equity interest and to obtain a debt claim will have the debt claim subordinated. Rescission will lead to subordination below the interest held before rescission.  However, if the security is common stock, the claim has the same priority as common stock.  If the security is an unsecured debt instrument, the claim that is represented by that security is a general, unsecured claim.   Since the claim

---

the debtor or of an affiliate or for damages arising from the purchase or sale of such a security shall be subordinated for purposes of distribution to all claims and interests that are senior or equal to the claim or interest represented by such security.

Apart from correcting a typographical error, the 1984 amendment added claims based on contribution or indemnification and states that when the underlying security is common stock, the claim is subordinated to the level of common stock.

[34]   *See KIT digital, Inc. v. Invigor Grp. Ltd. (In re KIT digital, Inc.)*, 497 B.R. 170, 178 (Bankr. S.D.N.Y. 2013) ("*KIT digital*") ("[B]y reason of the 'shall' in the second to last clause, subordination of any claims subject to section 510(b) is mandatory.").

[35]   11 U.S.C. § 510(b).

> represented by the instrument is a general, unsecured claim, any
> claim for rescission will be subordinated until the claims of the
> general unsecured creditors have been satisfied.[36]

A report of the United States House of Representatives sheds light on the purpose

of section 510(b):

> A difficult policy question to be resolved in a business bankruptcy
> concerns the relative status of a security holder who seeks to
> rescind his purchase of securities or to sue for damages based on
> such a purchase: Should he be treated as a general unsecured
> creditor based on his tort claim for rescission, or should his claim
> be subordinated? . . . [Professors Slain and Kripke] conclude that
> allocation of assets in a bankruptcy case is a zero-sum situation,
> and that rules of allocation in bankruptcy should be predicated on
> allocation of risk. The two risks to be considered are the risk of
> insolvency of the debtor and the risk of an unlawful issuance of
> securities. While both security holders and general creditors
> assume the risk of involvency[,] Slain and Kripke conclude that
> the risk of illegality in securities issuance should be borne by
> those investing in securities and not by general creditors.[37]

As explained by the Second Circuit in *Med Diversified*, "Congress . . . adopted

Slain and Kripke's policy rationales for mandatory subordination: '1) the

---

[36]     16 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶
510.04[1] (16th ed. 2013) ("Collier").

[37]     H. Rep. No. 595, 95th Cong., 1st Sess. (1977) at 194-95 (citing John
J. Slain and Homer Kripke, *The Interface Between Securities Regulation and
Bankruptcy – Allocating the Risk of Illegal Securities Issuance Between
Securityholders and the Issuer's Creditors*, 48 N.Y.U. L.Rev. 261 (1973) ("Slain
and Kripke")). Congress was greatly influenced by Slain and Kripke. *See id.* at
196 (stating that "[t]he bill generally adopts the Slain/Kripke position"), 195 ("The
argument for mandatory subordination is best described by Professors Slain and
Kripke.").

dissimilar risk and return expectations of shareholders and creditors; and 2) the reliance of creditors on the equity cushion provided by shareholder investment.'"[38] Either rationale can justify subordination under section 510(b), but courts have focused mainly on the risk-allocation rationale.[39]  The risk-allocation rationale "represents a Congressional judgment that, as between shareholders and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of stock in the event the issuer enters bankruptcy."[40]

Notably, this statement concerning the risk-allocation rationale is incomplete for two reasons.  *First*, as recognized in *Med Diversified*, section 510(b) is not limited to claims based on fraud in the issuance.[41]  Indeed, Slain and

---

[38]    *Rombro v. Dufrayne (In re Med Diversified, Inc.)*, 461 F.3d 251, 256 (2d Cir. 2006) ("*Med Diversified*") (citations omitted).

[39]    *See id.* at 259 (relying on the risk-allocation rationale and stating that of the two rationales it is "'more integral to any policy analysis of section 510(b)'") (quoting *In re Enron Corp.*, 341 B.R. 141, 166 (Bankr. S.D.N.Y. 2006) ("*Enron*")).  As explained in *Enron*, it is "unclear which rationale Slain and Kripke regarded as superior, if these concepts can even be neatly severed," but "Congress and the courts have clearly elevated the issue of risk [rather than creditor reliance] to the fore."  *Id.* at 166 n.21.

[40]    *Med Diversified*, 461 F.3d at 256.

[41]    *See id.* at 257 (recognizing that "the holdings of most prominent decisions of local bankruptcy courts also support the broad interpretation of section 510(b)"); *Enron*, 341 B.R. at 163 (stating that "the broad applicability of section 510(b) is now quite settled"); *KIT digital*, 497 B.R. at 181 ("While I certainly agree

Kripke were "only incidentally concerned with the precise predicate of a
disaffected shareholder's efforts to recapture his investment from the
corporation."[42]  *Second*, section 510(b) is not limited to shareholder claims.[43]
Section 510(b) uses the term "security," which is defined in section 101(49) of the
Bankruptcy Code as including stocks, bonds, and notes, among other instruments.
Accordingly, section 510(b) has been applied broadly to subordinate claims arising
in a variety of contexts, such as claims based on fraudulent retention,[44] as well as
other torts or breach of contract claims involving the failure to deliver, exchange,

---

that other Circuits have construed section 510(b) broadly, so has the Second
Circuit, along with bankruptcy and district court judges in the Second Circuit.").

[42]     Slain and Kripke, 48 N.Y.U. L. Rev. at 267.

[43]     *See id.* at 268 ("Hereafter, the discussion is focused upon the
rescinding stockholder.  Mutatis mutandis, the discussion is equally applicable to
holders of subordinated debentures and to other creditors whose debt securities are
contractually subordinated."); *Levine v. Resolution Trust Corp. (In re Coronet
Capital Co.)*, No. 94 Civ. 1187, 1995 WL 429494, at *8 (S.D.N.Y. July 12, 1995)
(finding that promissory notes are within the meaning of section 510(b) and
explicitly rejecting the argument that section 510(b) should be restricted to equity
securities); *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 281 F.3d 1173,
1177, 1182-83 (10th Cir. 2002) ("*Geneva Steel*") (upholding subordination of
claims related to bonds).

[44]     *See Geneva Steel*, 281 F.3d at 1182-83; *In re Granite Partners, L.P.*,
208 B.R. 332, 339 (Bankr. S.D.N.Y. 1997) ("*Granite Partners*").

or register securities.[45]  Courts have also subordinated claims for contribution,

indemnification, and reimbursement asserted by underwriters and others,[46] and

claims based on securities of an affiliate of the debtor.[47]  Courts also recognize that

---

[45]      *See Med Diversified*, 461 F.3d at 255 (failure to exchange); *Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)*, 281 F.3d 133, 138-42 (3d Cir. 2002) ("*Telegroup*") (failure to register); *American Broadcasting Sys., Inc. v. Nugent (In re Betacom of Phoenix, Inc.)*, 240 F.3d 823 (9th Cir. 2001) ("*Betacom*") (failure to deliver); *In re PT-1 Commc'ns, Inc.*, 304 B.R. 601, 608 (Bankr. E.D.N.Y. 2004) (tortious interference); *Frankum v. International Wireless Commc'ns Holdings, Inc. (In re International Wireless Commc'ns Holdings, Inc.)*, 257 B.R. 739 (Bankr. D. Del. 2001) (breach of stock purchase agreement), *aff'd*, 279 B.R. 463 (D. Del. 2002), *aff'd*, 68 Fed. App'x 275 (3d Cir. Apr. 16, 2003); *In re NAL Fin. Grp., Inc.*, 237 B.R. 225, 231 (Bankr. S.D. Fla. 1999) (failure to register debentures).

[46]      *See In re Jacom Computer Servs., Inc.*, 280 B.R. 570, 572 (Bankr. S.D.N.Y. 2002) ("*Jacom*") ("[U]nderwriters are in a better position to allocate risks associated with the issuance of securities and [ ] it is inconsistent with the policies articulated in the legislative history of section 510(b) to force unsecured creditors to subsidize the underwriters' litigation costs."); *In re Touch America Holdings*, 381 B.R. 95, 104-06 (Bankr. D. Del. 2008) (subordinating statutory indemnification claim asserted by directors and officers); *In re Mid-American Waste Sys., Inc.*, 228 B.R. 816, 824-26 (Bankr. D. Del. 1999); *Official Comm. of Creditors Holding Unsecured Claims v. PaineWebber Inc. (In re De Laurentiis Entm't Grp., Inc.)*, 124 B.R. 305, 308 (C.D. Cal. 1991).

[47]      *See In re VF Brands, Inc.*, 275 B.R. 725, 728 (Bankr. D. Del. 2002) (concluding that "[a]pplying section 510(b) requires that the [claimant's claim] (which is based on damages from the purchase of stock of an affiliate of the [debtors]) must be subordinated to the claims of the general unsecured creditors of the [debtors] which in the absence of that section would be equal in priority to its claim."); *Liquidating Trust Comm. of the Del Biaggio Liquidating Trust v. Freeman (In re Del Biaggio)*, No. 12 Civ. 6447, 2013 WL 6073367, at *7-8 (N.D. Cal. Nov. 18, 2013) ("*Del Biaggio*") (rejecting argument that affiliate and debtor

16

the claimant need not be an actual security holder,[48] and the debtor need not be the

issuer of the security for section 510(b) to apply.[49]

   In a number of differing contexts, courts have found the phrase

"arising from the purchase or sale of a security" to be ambiguous.  The source of

this ambiguity is typically the terms "arising from," which imply a causal

———————————————

securities "are not senior or junior to each other because they simply do not
compete for the same assets and distributions" and subordinating fraud claim to
those of debtor's unsecured creditors), *appeal docketed*, No. 13-17500 (9th Cir.
Dec. 9, 2013).  *Accord* Collier ¶ 510.04[4] ("Section 510(b) applies whether the
securities were issued by the debtor or by an affiliate of the debtor.").  However,
the legislative history of section 510(b) does not discuss the inclusion of affiliates
in the statute.

  [48]  *See Med Diversified*, 461 F.3d at 258 ("[A] claimant need not be an
actual shareholder for his claim to be covered by the statute."); *In re Walnut Equip.
Leasing Co.*, No. 97-19699, 1999 WL 1271762, at *6 (Bankr. E.D. Pa. Dec. 28,
1999) ("[T]he language of § 510(b) does not limit its application to any particular
type of claimant . . . but, rather, focuses on the type of claim possessed (*e.g.*, claim
for reimbursement or contribution).").  By the same token, "[n]othing . . . would
require the subordination of a claim simply because the identity of the claimant
happened to be a shareholder . . . ." *Telegroup*, 281 F.3d at 144 n.2.  "A typical
example of such an excluded claim is a personal injury tort claim asserted by a
shareholder.  In such a case, although there was a purchase of the debtor's security,
the tort claim does not 'arise from' that purchase . . . ." *Enron*, 341 B.R. at 156
n.12.

  [49]  *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, 2014 WL
3726123, at *6 (Bankr. S.D.N.Y. July 28, 2014) ("The plain language of section
510(b) does not include the term 'issuer,' nor does it refer to securities 'issued by'
or 'sold by' the debtor or an affiliate of the debtor; the Court is unwilling to read
such terms, or any ambiguity, into the statute.").

connection.[50]  For example, in *Telegroup*, parties to a stock purchase agreement that required the seller to use its best efforts to register the stock brought a claim based on the theory that had the seller registered the stock, they would have sold their shares and avoided their losses.[51]  The Third Circuit deemed section 510(b) ambiguous in this context, and explained that

> [f]or a claim to "aris[e] from the purchase or sale of . . . a security," there must obviously be some nexus or causal relationship between the claim and the sale of the security, but § 510(b)'s language alone provides little guidance in delineating the precise scope of the required nexus.  On the one hand, it is reasonable, as a textual matter, to hold that the claims in this case do not "arise from" the purchase or sale of Telegroup's stock, since the claims are predicated on conduct that occurred after the stock was purchased.  On the other hand, it is, in our view, more natural, as a textual matter, to read "arising from" as requiring some nexus or causal relationship between the claims and the purchase of the securities, but not as limiting the nexus to claims alleging illegality in the purchase itself.[52]

In the Third Circuit's view, section 510(b) "is reasonably read to encompass"

---

[50]    *See Granite Partners*, 208 B.R. at 339 (explaining that "[s]omething 'arises' from a source when it originates from that source.  Webster's New International Dictionary 117 (unabridged ed. 1976); Black's Law Dictionary 108 (6th ed. 1990).  The phrase 'arising from' signifies some causal connection.  *Cf.* Black's Law Dictionary 108 (defining 'arises out of').").

[51]    *See Telegroup*, 281 F.3d at 136.

[52]    *Id.* at 138.

claims based on the failure to register securities, as they "would not have arisen *but for* the purchase of Telegroup's stock and allege a breach of a provision of the stock purchase agreement."[53]

The Second Circuit considered the ambiguity of the phrase "arising from" in *Med Diversified*.[54]  In that case, a departing employee, David Rombro, entered into a severance agreement whereby Med Diversified agreed to issue shares of its common stock to Rombro in exchange for Rombro's shares in PrimeRX, an unaffiliated company.[55]  After Med Diversified filed for bankruptcy protection, Rombro asserted a claim based on its failure to consummate the exchange.  Relying on "case law broadly construing section 510(b)," the bankruptcy court determined "that the claim need not flow directly from the securities transaction, but can be viewed as 'arising from' the transaction if the transaction is part of the causal link leading to the injury."[56]

Rombro argued on appeal that "the phrase 'arising from' in section

---

[53]     *Id.* (emphasis added).

[54]     *Med Diversified* is the Second Circuit's only published opinion addressing section 510(b).

[55]     *See Med Diversified*, 461 F.3d at 253.

[56]     *Id.* at 254 (quotation marks omitted).

510(b) is unambiguous and plainly applies only to claims stemming directly from a purchase, sale, or rescission of the debtor's security, none of which occurred here."[57]  According to Rombro, "his claim did not arise from damages flowing from the purchase or sale of debtor's stock but from the purchase by the debtor of Rombro's PrimeRx stock, which in any event never occurred."[58]  The Trustee argued that "claims 'arising from' the purchase of a security . . . include claims that are predicated on the failure to issue stock, relying on case law broadly interpreting the statute."[59]  Although the Second Circuit found section 510(b) to be ambiguous, it nonetheless held that Rombro's claim arose from the purchase or sale of a security of the debtor in large part because once Rombro entered into the stock

---

[57]     *Id.* at 255.

[58]     *Id.* at 254.

[59]     *Id.* at 255.  The Second Circuit thus found that the phrase "'arising from' is ambiguous as applied to the claims in this case" and reviewed the purposes behind the statute to determine if there was a sufficient causal link. While *Med Diversified* is the only published Second Circuit decision interpreting section 510(b), the Second Circuit found section 510(b) to be *unambiguous* when applied to different facts in an unpublished decision.  *See In re MarketXT Holdings Corp.*, No. 08-5560, 346 Fed. App'x 744, 746 (2d Cir. Sept. 28, 2009) ("The bankruptcy court correctly began with the plain meaning of the statute. Furthermore, we agree with the bankruptcy court that Waltzer's claim, based on a state court judgement for damages in connection with the sale of stock, fell within the plain meaning of the statute.").

exchange agreement "he became bound by the choice he made to trade the relative safety of cash compensation for the upside potential of shareholder status – the very choice highlighted by Slain and Kripke."[60]

## V.   DISCUSSION

### A.   The Bankruptcy Court Did Not Err in Subordinating Claren Road's Claim

Claren Road argues that the Bankruptcy Court erred in finding that section 510(b) was unambiguous when applied to its claim.[61]  While Claren Road suggests that on a literal reading section 510(b) does not apply in the absence of an actual purchase or sale, it stresses that the Second Circuit deemed the statute to be ambiguous under a "similar factual scenario in *Med Diversified*."[62]  Thus, Claren Road argues that the Bankruptcy Court was obligated to consider section 510(b)'s legislative history and purpose to resolve this ambiguity, and, that if it had, it would have recognized that subordination of Claren Road's claim did not advance

---

[60]   *Med Diversified*, 461 F.3d at 256.

[61]   *See* Claren Road Mem. at 8-10.

[62]   *Id.*  Claren Road points out that the Third (*Telegroup*), Fifth (*Seaquest Diving*), Ninth (*Betacom*), and Tenth (*Geneva Steel*) Circuits, have also found section 510(b) ambiguous when applied to certain claims.

the statute's purpose.[63]

Claren Road argues that section 510(b) is squarely aimed at investors that attempt to bootstrap their way to parity with unsecured creditors by transforming their investment interests into unsecured claims.[64]  According to Claren Road, subordination of its claim does not further either the risk-allocation or equity-cushion policy rationales identified in *Med Diversified* as the only two policy rationales justifying subordination.[65]  This is because Claren Road did not "assume the risk or return expectations of a Lehman investor, much less an LBI equity holder" insofar as its claim arises from an attempt to dispose of the bonds for "a fixed sum of cash."[66]  In addition, Claren Road warns that "[a]llocating the risk associated with a prime-broker's insolvency to the broker's customers will have a negative impact on the prime-brokerage industry," because customers, who

---

[63]     *See id.* at 8-9.

[64]     *See id.* at 17 ("Section 510(b) is intended to prevent shareholders from obtaining creditor status by asserting tort or contract claims associated with an underlying equity transaction.  Section 510(b) thus protects the priority scheme established by the Bankruptcy Code.").

[65]     *See id.* at 15.

[66]     *Id.* at 15, 16, 18.  Claren Road also notes that there are no allegations concerning the equity-cushion rationale.

cannot easily identify whether a security has been issued by an affiliate of a broker-dealer, will refuse to do business with financially troubled broker-dealers for fear their claims will be subordinated under section 510(b), leading to more broker-dealer failures.[67]

The Bankruptcy Court did not err in holding that Claren Road's claim was subject to subordination under section 510(b).  *First*, even if the statute were ambiguous as to whether an "actual" purchase or sale is needed, under *Med Diversified* and other case law it is now well-settled that section 510(b) applies in the absence of an actual purchase or sale.[68]  Indeed, in *Med Diversified* the Second Circuit was "influenced by what appears to be the uniform determination of courts presented with similar claims" that section 510(b) mandated subordination even in

---

[67]       *Id.* at 19-20.

[68]       *See Med Diversified*, 461 F.3d at 258 (citing *Betacom*, 240 F.3d at 830-21); *Enron*, 341 B.R. at 150-51, 162-63; *PT-1 Commc'ns*, 304 B.R. at 609; *In re Worldwide Direct, Inc.*, 268 B.R. 69, 73 (Bankr. D. Del. 2001); *In re Einstein/Noah Bagel Corp.*, 257 B.R. 499, 508 (Bankr. D. Ariz. 2000) (subordinating claim based on failed purchase and stating that "the critical point is that the claim arises because of the inability to sell or the failure to purchase the security itself, not merely because the party asserting the claim may hold an equity security of the Debtor.").

the absence of a purchase or sale.[69]  As discussed below, the fact that Rombro

bargained to *buy* securities and Claren Road was attempting to *sell* securities does

not immunize Claren Road's claim from subordination.  In short, given "[t]he

weight of precedent favoring subordination" even where no purchase or sale has

occurred, "and the absence of persuasive precedent upholding the contrary

position, the ambiguity *vel non* of the statutory text" is beside the point.[70]

> *Second*, applying the statute to Claren Road's claim does not require

"arising from" to be read nearly as broadly as permitted under the case law.[71]  For

---

[69]     *Med Diversified*, 461 F.3d at 257 (citing *Betacom*, 240 F.3d at 830; *Telegroup*, 281 F.3d at 136).  The Second Circuit also noted that it found "a measure of support in the fact that Congress did not elect to address this trend in the courts, leaving section 510(b) unchanged by the recent bankruptcy reform legislation . . . ."  *Id.* at 257 n.1.

[70]     *Enron*, 341 B.R. at 157.  *Accord In re Motor Liquidation Co.*, No. 11 Civ. 7893, 2012 WL 398640, at *3 (S.D.N.Y. Feb. 7, 2012) ("*Motor Liquidation*") ("Regardless of whether the language of § 510(b) is ambiguous [ ] 'fraudulent retention' claims must be subordinated to the claims of general creditors.  Both Spirnak's fraudulent inducement and his fraudulent retention claims therefore fall squarely within the scope of § 510(b) and were properly subordinated by the Bankruptcy Court.").

[71]     *Compare Telegroup*, 281 F.3d at 138 (finding the statute ambiguous but subordinating claim based on the failure of seller to register securities) *with Kit digital*, 497 B.R. at 178 (subordinating claim based on failure to deliver additional stock under stock purchase agreement and stating that, "The clause 'arising from the purchase or sale' is not ambiguous at all when it's applied to an alleged breach of the agreement of purchase or sale itself, or to a fraud that induced such an

example, unlike Rombro in *Med Diversified*, Claren Road held the LBHI bonds

and was attempting to sell them, and the failure of that sale was a direct cause of

Claren Road's damages.[72]  For another example, even though causal ambiguity

weighs less heavily for Claren Road's claim than for claims under a fraudulent

retention theory, Claren Road's failed attempt to dispose of the bonds is the

functional equivalent of the fraudulent retention claims subordinated in cases like

*Geneva Steel*, *Granite Partners*, *Enron*, and *Motor Liquidation.*  Indeed, regardless

of the type of claim, precedent requires subordination of claims by *security holders*

that seek to recover, as Claren Road does, for *the loss in value* of a security issued

by the debtor or an affiliate.  Neither section 510(b) nor SIPA suggests an

exception for transactions involving broker-dealer debtors either purchasing or

selling affiliate bonds.  SIPA provides that section 510(b) applies in liquidation

---

agreement.") *and Enron*, 341 B.R. at 152 (subordinating fraudulent retention
claims and noting that, "Whereas the phrase 'arising from' unambiguously
describes the claims of defrauded purchasers, the same cannot immediately be said
of fraudulent retention claims.").

[72]     *See* Claren Road Reply at 3 (describing the Claren Road claim as a
"damage claim arising from the debtor's contractual breach of an agreement to buy
securities of the debtor's affiliate"); Claren Road Mem. at 5 (describing the Claren
Road claim as "representing the difference between the amount that LBI had
agreed to pay for the LBHI Bonds and their market price" on the date LBI was
placed into SIPA liquidation).

proceedings;[73] bonds, in keeping with their common meaning, are included in the definition of security;[74] and section 510(b) explicitly references both debtor *and* debtor-affiliate securities.[75]

Finally, the risk-allocation policy rationale supports subordination of Claren Road's claim. As the putative seller of LBHI bonds, there is no doubt that Claren Road was an LBHI bondholder.[76] The elephant in the room is that Claren

---

[73]    *See* 15 U.S.C. § 78fff(b) ("To the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of [the Bankruptcy Code]").

[74]    *See* 11 U.S.C. § 101(49)(A).

[75]    *See id.* § 510(b) (stating that "a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated"). As recognized by the Bankruptcy Court, courts applying section 510(b) where the debtor is a broker-dealer must "differentiat[e] between those claims arising from the purchase or sale of [ ] affiliated securities and those that arise from the purchase or sale of securities issued by unaffiliated third parties." Decision Below, 503 B.R. at 786. Thus, "[i]f Claren Road had a breach of contract claim against LBI for failing to close a trade relating to securities of an unaffiliated issuer, 510(b) would not apply." *Id.* at 786 n.12. Similarly, courts have held that section 510(b) does not apply to mortgage backed securities held in securitization trusts because the trusts are not affiliates of the debtor. *See Lehman Bros. Holdings Inc.*, 2014 WL 3726123, at *6; *In re Washington Mutual*, 462 B.R. 137, 145-46 (Bankr. D. Del. 2011).

[76]    *See Med Diversified*, 461 F.3d at 257; *Geneva Steel*, 260 B.R. at 523.

Road entered into its agreement with LBI on Friday, September 12, 2008, and as is well known, on Monday September 15, 2008, LBHI and certain of its affiliates filed petitions for relief under chapter 11 of the Bankruptcy Code, followed days later by LBI's SIPA proceeding.[77]  But Claren Road's motivation for selling the bonds is beside the point – "Just as the opportunity to sell or hold belong exclusively to the investors, the risk of illegal deprivations of that opportunity should too."[78]  Whether by holding an interest in the LBHI bonds or by entering into the agreement to have LBI purchase those bonds, Claren Road assumed the risk of exactly what happened here – the loss of its investment.[79]  Claren Road argues that the risk-allocation rationale does not apply because LBI agreed to pay a fixed sum of cash for the LBHI bonds, and that "in contrast to *Med Diversified*,

---

[77]     "[T]ogether these filings constitute the largest business bankruptcy in history."  *Lehman Brothers Special Financing Inc. v. BNY Corporate Trustee Services Limited (In re Lehman Brothers Holdings Inc.)*, 422 B.R. 407, 420 (Bankr. S.D.N.Y. 2010) ("Their various corporate entities comprise an integrated enterprise and, as a general matter, the financial condition of one affiliate affects the others.") (quotation marks omitted).

[78]     *Granite Partners*, 208 B.R. at 342.

[79]     Under the PBA, LBHI was not only listed as an affiliate but as a contracting party.  That LBI's and LBHI's fates were tied together was thus apparent from the face of the PBA alone.  I also note that the PBA undercuts Claren Road's policy argument to the extent it concerns the inability of investors to know whether they are purchasing affiliate securities.

where the claimant contracted to acquire *more* stock, Claren Road sought to *dispose* of the LBHI Bonds, thereby terminating its right to share in any appreciation in price."[80]  However, Claren Road still held the LBHI bonds as of the petition date, and its claim is based in part on the diminished value of those bonds.[81]  Furthermore, the distinction drawn by Claren Road between Rombro's

---

[80]    *See* Claren Road Mem. at 16 (emphasis in original).

[81]    These facts distinguish the cases cited by Claren Road.  *See CIT Grp. Inc. v. Tyco Int'l Ltd. (In re CIT Grp.)*, 460 B.R. 633, 640 (Bankr. S.D.N.Y. 2011) ("*CIT Group*") (claimant sold its shares over seven years before the debtor filed for bankruptcy protection), *aff'd*, No. 12-1692, 479 Fed. App'x 393 (2d Cir. Sept. 6, 2012); *Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.)*, 361 B.R. 369, 390 (Bankr. S.D.N.Y. 2007) ("*Marketxt*") ("Softbank may have taken an equity risk when it purchased preferred stock, but by the date of the initial bankruptcy petition it was a creditor, not an equity holder.  It is black letter law that claims are analyzed as of the date of the filing of a petition, not as of a hypothetical date in the past."); *Burtch v. Gannon (In re Cybersight LLC)*, No. 05-112, 2004 WL 2713098, at *4 (D. Del. Nov. 17, 2004) ("In contrast to the circumstances in *Telegroup*, Mr. Gannon's equity stake in Cybersight extinguished pre-petition and with it Mr. Gannon's ability to participate in any of Cybersight's profits or losses."); *Official Comm. of Unsecured Creditors v. American Capital Fin. Servs., Inc. (In re Mobile Tool Int'l, Inc.)*, 306 B.R. 778, 782 (Bankr. D. Del. 2004) ("*Mobile Tool*") (same); *In re Wyeth Co.*, 134 B.R. 920, 921 (Bankr. W.D. Mo. 1991) ("*Wyeth*") (same).  As explained in *CIT Group*, the "'causal connection' between the purchase or sale of a security" in the cases cited by Claren Road "was too remote to require subordination of a contract claim when the purpose and intent of the statute was considered."  *CIT Group*, 460 B.R. at 643 (describing *Marketxt*, *Mobile Tool*, and *Wyeth*).  *CIT Group* is distinguishable for the further reason that its analysis applies only to equity securities and would arguably exclude any claim based on debt securities.

attempt to acquire securities in *Med Diversified* and Claren Road's attempt to divest its interest in securities is legally irrelevant.[82]  "The fact that the value of the [bonds] declined while [Claren Road] held them . . . should not enable [Claren Road] to eviscerate the absolute priority rule, and shift to creditors the investment risk assumed by the [bond] holders."[83]  In short, subordination of Claren Road's claim pursuant to section 510(b) is justified because it prevents Claren Road from converting its investment loss into a creditor claim.[84]

### B.   The Bankruptcy Court Did Not Err in Subordinating Appellants' Claims to the Claims of General Unsecured Creditors

#### 1.   Claren Road

Claren Road argues that the "language directing subordination of the

---

[82]     As noted earlier, Slain and Kripke were "only incidentally concerned with the precise predicate of a disaffected shareholder's efforts to recapture his investment from the corporation."  Slain and Kripke, 48 N.Y.U. L. Rev. at 267.

[83]     *Geneva Steel*, 260 B.R. at 523 (quotation marks and alterations omitted).  *Accord Jacom*, 280 B.R. at 572 ("[I]t is readily apparent that the rationale for § 510(b) is not limited to preventing shareholder claimants from improving their position vis-a-vis general creditors; Congress also made the decision to subordinate based on risk allocation.") (quotation marks omitted).

[84]     This is true regardless of whether the record establishes that Claren Road benefitted from appreciation based on its ownership of the LBHI bonds – section 510(b) does not contain an exception for either unsuccessful or short-term investors.

asserted claim to claims or interests 'represented by such security' makes no sense where the applicable security creates no claim on the debtor's estate."[85]   According to Claren Road, its claim "and claims 'represented by' LBHI Bonds simply do not exist in the same priority chain."[86]   Claren Road thus contends that "[a]s written, section 510(b) offers no guidance regarding its application when the debtor and the issuer of the subject security are separate entities" and therefore the phrase "represented by such security" is ambiguous when applied to a claim arising from securities of an affiliate.[87]   In support of this point, Claren Road argues that "[f]our separate interpretations of the phrase were put forward in this case alone, including two articulated by the Bankruptcy Court."[88]   Claren Road's interpretation was that the language refers to the underlying security and that subordination is proper only when there is a close nexus between the affiliate security and the asserted claim, "such as when the debtor has guaranteed the security in question or entered into an agreement to deliver to a creditor the debtor's subsidiary's securities in full

---

[85]   Claren Road Reply at 6.

[86]   Claren Road Mem. at 10.

[87]   *Id.* at 10-11.

[88]   *Id.* at 11.

satisfaction of a debt . . . ."[89]

The Trustee, in turn, argued that "because the LBHI Bonds have 'no valid interests' against LBI, the Claren Road Claim must be subordinated to zero."[90]  At the hearing on the claim objection, the Bankruptcy Court suggested a "virtual security" where one assumes that the security of an affiliate is the security of the debtor.  Finally, Claren Road argues that the Bankruptcy Court "rejected all of these approaches" and found that a claim represented by the LBHI bonds includes "all claims with respect to or connected to the subject matter of the LBHI Bonds."[91]  Thus, Claren Road argues that the Bankruptcy Court erred by not considering the legislative history and purpose of section 510(b), and that subordination of a claim based on securities issued by an affiliate is proper only when such subordination furthers either the risk-allocation or equity-cushion rationales identified in *Med Diversified*.[92]  As discussed earlier, Claren Road argues that neither rationale applies.

---

[89]     *Id.*

[90]     *Id.* (quotation marks omitted).

[91]     *Id.* at 12 (quotation marks omitted).

[92]     *See* Claren Road Reply at 7 n.5.

However, the statute directs that Claren Road's claim "for damages arising from the purchase or sale of [the LBHI bonds]" be subordinated for purposes of distribution to "all claims or interests that are senior to or equal the claim or interest represented by [the LBHI bonds.]"  In other words, the statute separately refers to the claim subject to subordination, the underlying debtor or affiliate security, and the claim or interest represented by that security.

But nothing in section 510(b) ties subordination to a security within the capital structure of the debtor.  Claren Road's argument to the contrary simply assumes that this must be the case because otherwise the claim to be subordinated and the claim represented by the security would not be in the same priority scheme which, Claren Road argues, makes it impossible to define the level of subordination.  Claren Road's substantive argument – that the security must exist within the capital structure of the debtor – is not only unsupported by the plain language of the statute, but contradicted by the statute's inclusion of affiliate securities.

This is not to say that Claren Road's assumption about the priority scheme is implausible.  As one court notes, "[i]t is true that generally shareholders of a subsidiary have no claim against the parent and thus are not part of any

priority scheme of claims against the parent."[93]  However, section 510(b) unambiguously states that rescission, arising-from, and contribution claims involving securities of an affiliate of the debtor are subject to subordination.  Thus, any ambiguity in the statute lies not in *whether* claims based on securities of an affiliate are to be subordinated but *how* that subordination is to occur.  For this reason, Claren Road's assumption about the priority structure is untenable as it would automatically exclude claims arising from the purchase or sale of securities of an affiliate in derogation of the plain language of the statute.

        At the same time, Claren Road's procedural argument – that it is impossible to define the relevant priorities – is easily overcome.  Under section 510(b), Claren Road's claim is a claim based on LBI's breach, the securities involved in that claim are the LBHI bonds, and because the LBHI bonds are unsecured debt instruments, the most natural way to read section 510(b) is that the

---

        [93]     *VF Brands*, 275 B.R. at 727 (subordinating claims based on affiliate securities).  In *VF Brands*, the court rejected the argument that because "there is no general principle which states that claims of general unsecured creditors of a parent are senior to the claims of shareholders of its subsidiary[,]" section 510(b) does not require subordination of claims based on affiliate securities to claims held by the debtor's creditors.  *Id.*  Similar to the Bankruptcy Court here, the court in *VF Brands* looked to the type of claim asserted by the claimant and determined that because the claim was an unsecured claim, section 510(b) required that it be subordinated to the claims of general unsecured creditors.  *See id.*

33

claim "represented by" such unsecured debt instruments is an unsecured claim. Accordingly, Claren Road's claim is properly subordinated to claims of unsecured creditors.[94] This focus on the type of claim the security represents, rather than where the security falls in the capital structure of the debtor, promotes the purpose of section 510(b), which is to ensure that creditors receive their distribution ahead of investors. By contrast, Claren Road places greater importance on the structure of the priority scheme than the requirement of subordinating certain types of claims for the benefit of creditors.

In addition, it is not reasonable to read section 510(b) as applying only when there is a close nexus between the affiliate security and the asserted claim. Section 510(b) states that a claim "*arising from* the purchase or sale of" a security of a debtor *or an affiliate* of the debtor "*shall be subordinated* to all claims or interests that are senior to or equal the claim or interest represented by such security . . . ." The statute's application to securities of an affiliate is therefore

---

[94] Thus, while I reach the same result as the Bankruptcy Court, I do so not by looking at the type of claim asserted, but rather by looking at the type of claim represented by the security. *See* Decision Below, 503 B.R. at 784; *VF Brands*, 275 B.R. at 726-27. Regardless of the approach, I agree with the Bankruptcy Court and other courts that arising-from claims in the affiliate context must at the very least be subordinated to general unsecured claims to effectuate the purpose of the statute. *See Del Biaggio*, 2013 WL 6073357, at *7; *VF Brands*, 275 B.R. at 726-27; *Lernout & Hauspie Speech Prods.*, 264 B.R. at 343-44.

unambiguous.  Furthermore, the phrase "arising from" –  which implies a causal connection – modifies the types of claims that are subject to mandatory subordination, not how those claims are to be subordinated.  Neither the phrase "represented by" nor its placement in section 510(b) implies a causal connection requiring a close nexus between the security and the asserted claim.[95]  Finally, for the reasons discussed above, subordination of Claren Road's claim fits within the purpose of section 510(b).  After all, had Claren Road not entered into the transaction with LBI involving LBHI bonds, it would not have a claim against LBI relating to the diminished value of the LBHI bonds at all (although it would still have a claim against LBHI).  Section 510(b) prevents Claren Road from collecting *pari passu* with LBI's general unsecured creditors by virtue of its failed attempt to sell the LBHI bonds.

### 2.    The Co-Underwriters

The co-underwriters concede that their claims are for contribution within the meaning of the first portion of section 510(b).  They argue that claims "represented by" LBHI securities must mean claims that are based on *ownership* of

---

[95]    *See* ANZ Mem. at 10 (citing to dictionaries defining "represent" to mean "to correspond in kind" and "to correspond in essence: Constitute") (citations omitted).

LBHI securities.  They then argue that because LBHI securities "do not represent a claim that can be made in the LBI case" there are no claims in LBI's case to which their claims can be subordinated.[96]  Alternatively, the co-underwriters argue that subordination of their claims does not serve the purposes behind section 510(b).[97]

As explained by the Bankruptcy Court, the co-underwriters' "strained argument . . . assumes that the claims must be based on securities within the capital structure of an enterprise that includes a debtor and its affiliated securities."[98] However, as discussed in connection with the Claren Road claim, that assumption is not supported by the statutory text.  A straightforward and practical application of section 510(b) recognizes that unsecured, non-equity securities represent unsecured claims, meaning that claims involving such securities must be subordinated to general unsecured claims, and when the relevant security is common stock the underlying claim is subordinated to the level of common stock.[99]

---

[96]    Decision Below, 503 B.R. at 786-87.

[97]    *See* ANZ Mem. at 20-24; UBSFS Mem. at 11-14.

[98]    Decision Below, 503 B.R. at 787.

[99]    As discussed above in footnote 94, I reach the same result as the Bankruptcy Court but based on the type of security and not the type of claim.

As one court notes, when a "provision such as section 510(b) [ ] plainly incorporates a broad standard," textual analysis "has a tendency to miss the forest for the trees."[100]  The co-underwriters' arguments seize on the opportunity to parse section 510(b) in the relatively untested context of the treatment of claims based on securities issued by an affiliate of the debtor in a SIPA liquidation.  What is lost in this effort is that there is no question that their claims would be subordinated to the claims of general unsecured creditors if they were based on LBI securities in the SIPA proceeding or LBHI securities in LBHI's bankruptcy case.  In either scenario, the precise meaning of "represented by" would not be relevant to the issue of subordination.[101]  Because claims for contribution arising

---

However, it is not entirely clear what types of securities were involved in the numerous transactions underwritten by ANZ.  Accordingly, to the extent that unsecured creditors will be paid in full, leaving a distribution to subordinate claimants, the Bankruptcy Court is directed to determine the appropriate level of subordination of ANZ's claims.

[100]     *Enron*, 341 B.R. at 159 ("Distinctions between possible and actual word choices, or analysis of the textual construction and word placement, are of minimal independent value, particularly where alternative analyses at the same level of specificity produce contrary conclusions.").

[101]     ANZ states that "neither courts nor commentators have indicated that 'the claim or interest represented by such security' was anything other than a claim based on ownership of the security."  ANZ Mem. at 12.  However, those courts and commentators were not considering the affiliate issues raised here.

from transactions based on securities of an affiliate of the debtor are plainly subject to subordination under section 510(b), it would be anomalous to restrict section 510(b)'s application to the rare contexts suggested by the co-underwriters.[102]  For example, the Bankruptcy Code does not expressly provide for substantive consolidation, making it unlikely that Congress would have relied on that mechanism to provide meaning to the "affiliate" language in section 510(b).[103]

The co-underwriters argue that the risk-allocation rationale does not apply when the securities have been issued by an affiliate of the debtor.[104]  But by including securities of affiliates in section 510(b), Congress has already made the

---

[102]   *See* UBSFS Mem. at 9 (arguing that its position does not mean that a claim based on a security issued by the debtor's affiliate would never be subordinated because "there are at least two such situations: 'when the debtor has guaranteed payment or the estates are consolidated'") (quoting Decision Below, 503 B.R. at 787); ANZ Mem. at 3 (advancing the same argument).

[103]   *See In re Augie/Restivo Baking Co., Ltd.*, 860 F.2d 515, 518 (2d Cir. 1988) ("Substantive consolidation has no express statutory basis but is a product of judicial gloss.").  In chapter 11, a plan must provide adequate means for implementation, such as merger or consolidation with other entities.  See 11 U.S.C. § 1123(a)(5)(C).  Courts have interpreted this provision as permitting substantive consolidation under a plan of reorganization.  Substantive consolidation in the SIPA context is rare and works to bring individuals or entities *into the SIPA liquidation*, not into a case under the Bankruptcy Code.  *See, e.g.*, *In re New Times Sec. Servs., Inc.*, 371 F.3d 68, 73 (2d Cir. 2004).

[104]   *See* ANZ Mem. at 21-24; UBSFS Mem. at 11-12.

judgment that claims for contribution based on such securities must be subordinated.  This is because "underwriters are in a better position to allocate risks associated with the issuance of securities and [ ] it is inconsistent with the policies articulated in the legislative history of section 510(b) to force unsecured creditors to subsidize the underwriters' litigation costs."[105]

## VI.   CONCLUSION

In sum, section 510(b) mandates the subordination of arising-from and contribution claims, provided such claims are based on securities of a debtor or an affiliate of the debtor.  The level of subordination can be determined by reference to the type of claim or interest represented by such security – *e.g.*, secured, unsecured, common stock, or equity.  In cases involving affiliate securities, the type of security dictates the level of subordination whether or not that security represents an actual claim in the debtor's case.  For the foregoing reasons, the two Orders entered by the Bankruptcy Court are AFFIRMED.  The Clerk of the Court is directed to close these appeals.

---

[105]   *Jacom*, 280 B.R. at 572.  This statement is no less true when securities are issued by an affiliate or when the securities do not represent a claim that can be made in the debtor's case – these facts do not change the status of either the underwriters or the creditors or their respective claims.  The Court has considered the other arguments raised by the co-underwriters and rejects them.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:       New York, New York
             September 5, 2014

**- Appearances -**

**For Appellant Claren Road Credit Master Fund Ltd.**

Marshall R. King, Esq.
Matthew J. Williams, Esq.
Joshua Weisser, Esq.
Gibson, Dunn, & Crutcher LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000


**For Appellant UBS Financial Services Inc.:**

Joshua Dorchak, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10166
(212) 705-7000

**For Appellants ANZ Securities, Inc., BMO Capital Markets Corp., BNY Mellon Capital Markets, LLC, Cabrera Capital Markets, LLC, DNB Markets, Inc., BNP Paribas FS, LLC, nabSecurities, LLC, National Australia Bank Ltd., SunTrust Robinson Humphrey, Inc. and The Williams Capital Group, L.P.**

Mitchell A. Lowenthal, Esq.
Luke A. Barefoot, Esq.
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000

**For Appellee James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers, Inc.:**

James B. Kobak, Jr., Esq.
Michael E. Salzman, Esq.
Ramsey Chamie, Esq.
Dina R. Hoffer, Esq.
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6000